[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-15968
_____

D.C. Docket No. 2:09-cv-14388-DLG

SUSAN LIESE,
JAMES LIESE,

Plaintiffs - Appellants,

versus

INDIAN RIVER COUNTY HOSPITAL DISTRICT,
INDIAN RIVER MEMORIAL HOSPITAL, INC.,
d.b.a. Indian River Medical Center,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(November 13, 2012)

Before DUBINA, Chief Judge, MARCUS and FAY, Circuit Judges.

MARCUS, Circuit Judge:

In this appeal, Susan and James Liese, the plaintiffs, challenge the district court's order granting summary judgment in favor of the defendant, Indian River Memorial Hospital, Inc. ("IRMH" or the "Hospital").  The Lieses, who both suffer from severe hearing impairment, brought this suit against IRMH under § 504 of the Rehabilitation Act of 1973 (the "RA" or "Rehabilitation Act"), 29 U.S.C. § 794, and Florida state law alleging a failure to communicate effectively when Susan Liese sought treatment at the Hospital's emergency room in November 2007.  The Lieses say that the failure of the Hospital and its medical personnel to respond to their repeated requests for a sign-language interpreter states a valid claim for compensatory damages under the Rehabilitation Act, and a basis for recovery by Susan Liese under Florida law because of the Hospital's negligent infliction of emotional distress.

This appeal raises two central legal questions: whether the defendant's "deliberate indifference," if proven, is sufficient to establish intentional discrimination under § 504 of the RA; and whether the actions of medical personnel, including doctors and nurses employed by IRMH and involved in treating the plaintiffs, can be attributed to the Hospital.

After thorough review and taking the facts in a light most favorable to the

2

non-moving parties, we answer the first question in the affirmative.  As for the second question, we hold that the actions of the Hospital's doctors may be attributed to the Hospital for purposes of establishing liability under the Rehabilitation Act.  The Lieses have alleged sufficient facts to withstand summary judgment on their claim for compensatory damages.  Moreover, the record evidence, when taken in a light most favorable to the Lieses, would allow a reasonable jury to find by a preponderance of the evidence that IRMH doctors, who were clothed with complete discretion in deciding whether to provide necessary communicative aids to Susan Liese, were deliberately indifferent to her rights under the Rehabilitation Act.  Accordingly, we reverse the grant of summary judgment to the Hospital on the Lieses' Rehabilitation Act claim and remand for further proceedings consistent with this opinion.  However, the district court properly entered summary judgment for the Hospital on Susan Liese's state law claim for negligent infliction of emotional distress.

## I.

Because we are reviewing the district court's grant of summary judgment to the defendant, we view the facts and draw all reasonable inferences in a light most favorable to the plaintiffs.  See Gentry v. Harborage Cottages-Stuart, LLLP, 654 F.3d 1247, 1255 (11th Cir. 2011).

A.

The essential facts, taken in that light, are these: IRMH leases and operates a hospital in Vero Beach, Florida, that receives federal financial assistance. IRMH maintains a policy entitled "Communication Barriers" that describes itself as "a plan for effectively communicating in the language needed by the patient as well as assistance for the hearing impaired." The Hospital's policy includes several provisions relevant to this case. Three different mechanisms for communicating with individuals with communication disabilities are included within the plan and are found under the heading "Interpreter Availability": interpreter lists, an AT&T Language Line, and a video-interpreter service called "My Accessible Real-Time Trusted Interpreter" ("MARTTI"). The interpreter lists section observes that "Interpreter Lists (for foreign languages and sign language) are available on the Intranet." It also provides that "clinical interpreters may be used when clinical interpretations are necessary," while "non-clinical interpreters are used only for demographic information, billing information, etc." The "AT&T Language Line" is an audio-based means of interpretation for speakers of foreign languages that is available at all times by calling the Hospital operator and requesting assistance. Finally, MARTTI -- a videoconferencing system that provides interpreters for speakers of foreign languages and hearing-impaired individuals who need to use

4

sign language -- is also available at <u>any</u> time and is kept in a storage room in the emergency room of the Hospital.  Significantly, the policy does not give any guidance or recommendations as to when Hospital staff should use these communicative aids.  Rather, medical personnel have complete discretion in this matter.

As counsel for IRMH conceded at oral argument, the Hospital's medical staff -- including doctors and nurses -- had the power to order that any of these communication mechanisms be provided to a hearing-impaired patient.  One nurse testified that she had used MARTTI with a patient after a psychiatrist had directly ordered the use of MARTTI.  Annette Barton-Riley, who served as director of risk management and as privacy and compliance officer at the Hospital between 2002 and 2008, testified that a patient would generally request an interpreter through his "care provider," a term that Barton-Riley defined as "a nurse."  She added that, if a nurse refused to provide an interpreter, a patient could ask for a supervising nurse to review that decision.  Nevertheless, she stressed that a nurse had the authority to order an interpreter for a patient and that it was "up to the staff to assess what the patient's needs are and make a determination as to what would meet those needs."  Although the "Communication Barriers" policy itself says that accessing MARTTI requires calling security to arrange a delivery of the machine, two IRMH nurses

5

said in their depositions that they could also go to the emergency room and retrieve the equipment themselves.

In an earlier lawsuit against the Hospital in 2005, Susan Fisher, a hearing-impaired individual, sued IRMH alleging that IRMH had failed to provide effective communication to deaf individuals. Fisher and IRMH eventually settled the claim. The agreement provided for a monetary recovery by Fisher, training by IRMH "on treatment of the hearing impaired," and the purchase of videoconferencing equipment by IRMH within six months of the settlement. The agreement also required IRMH to inform hearing-impaired patients of available services and maintain a list of qualified interpreters in the area.

In March 2007, IRMH's education department conducted a training session on the use of the MARTTI machine, which was attended by more than eighty Hospital employees. A nurse who attended this training recalled it lasting approximately ten minutes and that it gave only instructions on how to get MARTTI and a demonstration on how to use the machine. The nurses deposed in this case who treated Susan Liese expressed varying levels of familiarity with IRMH's "Communication Barriers" policy.[1] Two nurses who were specifically

---

[1] One nurse had no knowledge of whether IRMH had any policy regarding the deaf or hearing impaired, while another did not recall if there was such a policy. A third nurse, however, knew all three means of communication in the "Communication Barriers" policy.

questioned about communicating with the hearing impaired offered various means of communication: speaking louder; lipreading; the use of written messages or charts; and the use of sign language, if necessary, through an interpreter.

### B.

It is against this backdrop that the plaintiffs entered the Hospital's emergency room in November 2007. Susan Liese ("Liese") is sixty-seven years old and suffers from extensive hearing loss. Due to a childhood illness, she is deaf in her right ear and has severe hearing loss in her left ear. Her husband, James Liese, is seventy-eight years old and deaf. They communicate with each other primarily in sign language. Susan Liese is fluent in American Sign Language ("ASL"), while her husband uses a combination of "signed English and ASL." The Lieses claim that Susan Liese reads at a fourth-grade level and that James Liese reads at a sixth-grade level. James Liese also testified at his deposition that it is hard for him to read fine print because he suffers from a vision disorder that he called "age macro degeneration," or AMD.

On November 28, 2007, Liese went to the Hospital with her husband. Liese had called her primary care doctor -- Dr. Brown -- through a video relay service, complaining that she was experiencing dizziness and chest pains. The doctor ordered Liese to go directly to the emergency room. Upon arriving at IRMH, the

7

Lieses went to the front desk.  The front desk employee and Susan Liese

exchanged written notes to convey Susan Liese's identifying information and her

reason for coming to the Hospital.  Both Susan Liese and James Liese asked for an

interpreter at the front desk.  The requests were made in writing and orally: James

Liese passed a note requesting a "sign language interpreter," while either James

Liese or Susan Liese orally asked for an interpreter.  The front desk employee

orally responded that the nurse would take care of it.  Susan Liese did not

understand what the employee said, but James Liese explained to her what the

employee had said.  The Lieses then moved to a small waiting room in the

emergency room.  A Hospital employee (it is unclear which one) mouthed

repeatedly, "Doctor will be with you."[2]

---

[2]  At her deposition, Liese offered the following:

> Q. So someone told you that the doctor would be there or you
> would be seen by a doctor shortly?
>
> A. That's all he kept on mouthing, "Doctor will be with you.
> Doctor will be with you."  I sat in this room.  I waited for a long
> time.  A doctor came in, immediately looked at me, then went back
> out.  I can't remember which doctor came in . . . .  He was
> checking the x-rays.  I was puzzled with what was going on, no
> name, I don't know who that was.
>
> Later on, [a] doctor came in.  "Can you read my lips?"
>
> I said, "I don't understand."  My husband didn't know what was
> going on, and we asked for an interpreter because we couldn't
> understand.

Several doctors were involved in treating Liese in the ER, but the exact nature of her interaction with each one is unclear from the record. Liese told one of the emergency room doctors that she could read lips "some." A "second person" -- whom Liese believes to have been Dr. Theodore Perry ("Dr. Perry") -- conducted a more thorough examination. Liese's exact interaction with Dr. Perry is not entirely clear from the record. At one point he asked her, "Can you read my lips?" She responded, "No." Liese also testified that, at some point, the following exchange occurred: "[Dr. Perry] laughed at me, can you read my lips? He was overexaggerated. And I said thank you. And my husband could, but not completely." Liese testified that, besides this brief exchange, she could not understand Dr. Perry. She does not recall if Dr. Perry communicated in any other way at that time.

During her meeting with Dr. Perry, Liese verbalized that she had chest pain

---

"You understand me?"

And he goes, like, "No, no, I don't know what's going -- I don't understand what's going on."

So someone else came in. So it was that -- and they -- they understand me. They had no nametag or anything.

"Where's the interpreter?"

Nothing.

9

and dizziness.  After the examination, Liese again verbally asked for an interpreter from "[o]ne of the staff or a nurse," who responded that he or she would "get something called a VIP."[3]  Liese further said that she asked "everybody who came in . . . the nurse, the doctor, the phlebotomist . . . for an interpreter."

Several tests were performed on Liese in the emergency room.  She says that she had minimal communication with the individuals performing the tests; she was not told why the tests were necessary, and she learned only what the tests were. In response to her question asking why she needed an X-ray, the individual responded "X-ray"; in another situation, the person said "heart" and "pointed to the heart" before conducting what Liese believes to have been an EKG.[4]  Liese saw her two doctors talking with one another after an ultrasound had been performed; she did not know what they were saying and did not inquire about their conversation.

Sometime in the afternoon, after the tests were concluded, Dr. Perry informed Liese that her gallbladder needed to be removed and that it was an

---

[3] As discussed below, Nancy Paulsen, Susan Liese's daughter who suffers from no communicative disabilities, called IRMH and requested an interpreter for her mother from "a female nurse."  Paulsen said she believed that the nurse had called the "video box" that would substitute for an interpreter a "VIP box."  Both Liese's and Paulsen's conversations could therefore reasonably be construed as referring to MARTTI.

[4] Liese recounted, "I can't hear what they're talking about. . . . I don't understand nothing.  I wish I had an interpreter there, but I wasn't, it's depressing."

10

emergency.  Dr. Perry explained the manner in which the surgery would be performed through a combination of speaking, pantomime, and note-writing. According to Liese, Dr. Perry was "pointing and pointing . . . to all my tubes, a light or what would go inside" as part of his explanation.  Dr. Perry also said that the surgery would be "laparoscopic," a word that Dr. Perry wrote down on a piece of paper and gave to Liese.  He apparently wrote other notes to Liese as well, but it "wasn't like a back and forth communication of writing, notes back and forth to each other.  It was a word and then he explained the word."  Instead, Liese said both she and Dr. Perry "mostly" communicated orally.  Liese testified that she did not understand the notes, but she did not tell Dr. Perry that she did not understand what he had written.  She did, however, again request an interpreter; Dr. Perry said nothing in response.  When Liese asked Dr. Perry why she was having surgery on her stomach when she was having pains in her chest, he simply wrote a short note saying "remove it and you'll feel better after that."  To be sure, the facts offered by Susan Liese and Dr. Perry differ significantly.  Indeed, Dr. Perry testified that Susan Liese "never" asked him for an interpreter and that he "would have walked out of the room and got her an interpreter" if she had done so.  At this stage in the proceedings, we are obliged to accept Susan Liese's account.

Later that day, Liese sent a text message to her daughter, Nancy Paulsen.

11

Liese told Paulsen that she was in the hospital and was going to have surgery. Paulsen asked her mother whether an interpreter had been provided. When Liese told her that no interpreter had been provided, Paulsen called the Hospital and was transferred to a nurse on Liese's floor. Paulsen inquired about an interpreter; the nurse responded that "they were working on it" and that a "video box" that was as good as an interpreter would be provided. Paulsen also learned during the phone call that Liese had to undergo an emergency gallbladder-removal surgery because of gallstones.

At some point, Liese was informed that her surgery was scheduled for the following day and that she would have to spend the night in the hospital. The next morning, on the day of the surgery, Dr. Perry visited Liese to talk about the surgery. Liese again asked him, "Why -- why are you removing -- removing the gallbladder? I have chest pains. I had no abdomen pains." She does not remember his exact response, except that he merely reiterated that it needed to be removed without providing any explanation. She again asked Dr. Perry for an interpreter; and again, Dr. Perry did not respond.

A nurse then provided Liese with a consent form for the surgery. Liese said that the nurse gave her the form, said only "please sign," and that the consent form was "for surgery." Liese explained that she did not read the consent form, that she

12

could not understand it, and that her husband read only "the top part, not the fine print underneath." Dr. Jose Ortega ("Dr. Ortega"), an anesthesiologist, also visited Liese at some point during the morning of her surgery. Dr. Ortega told her he was going to provide anesthesia. He did not give any additional explanation, but Liese says she "knew what [anesthesia] mean[t]" from prior surgeries. Liese claims that she signed the anesthesia consent form, that she read only the top part, and that her husband told her that the form was for "putting [her] to sleep" and to sign it. The Lieses did not ask Dr. Ortega any questions, and Liese said that she did not have any "difficulty in communication" with Dr. Ortega. Liese never told anyone that she could not understand any of the consent forms.

Liese then proceeded to surgery, which was, by all accounts, successful. After the surgery, Dr. Perry visited Liese. According to Liese, "he looked at the chart thing, and he said, 'Go home, rest,' and thumbs up." She added that she could not understand the remainder of what he had said.

The plaintiffs brought this lawsuit in the United States District Court for the Southern District of Florida in November 2009. Both Susan Liese and James Liese alleged that the Hospital's failure to provide auxiliary aids necessary to ensure effective communication violated § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Susan Liese also sued IRMH, Dr. Ortega, and Dr. Perry under

13

state law for failing to obtain informed consent and for the negligent infliction of emotional distress. Both Dr. Perry and Dr. Ortega were eventually dismissed from the lawsuit, leaving IRMH as the only defendant.

The district court ultimately granted IRMH's motion for summary judgment on all claims. The court had originally granted summary judgment to IRMH on the state law claims but had denied summary judgment on the Rehabilitation Act claim. However, the court reconsidered its decision on the Rehabilitation Act claim sua sponte after it concluded that the facts surrounding the earlier Fisher settlement would be inadmissible under Federal Rule of Evidence 408 (Compromise Offers and Negotiations) to establish IRMH's liability in the case. In reconsidering IRMH's motion for summary judgment on the Rehabilitation Act claim, the district court determined that the Lieses had not offered sufficient evidence in the absence of the Fisher settlement to state a valid claim for compensatory damages under the Rehabilitation Act. The district court observed that this Court had not yet decided whether deliberate indifference or discriminatory animus was the proper standard for establishing the discriminatory intent required to recover compensatory damages under the Act. However, it concluded that the Lieses' claim failed anyway as a matter of law under the less-stringent deliberate indifference standard, since the Hospital had a policy in

14

place regarding communicative barriers and conducted employee training on the issue. Ultimately, the district court determined that while IRMH may have negligently violated the Rehabilitation Act, negligent conduct was not sufficient.

The plaintiffs timely appealed the district court's grant of summary judgment on the RA and negligent infliction of emotional distress claims, as well as an order excluding the Fisher settlement, and a protective order limiting examination of two nonparty doctors.

## II.

We review a district court's grant of summary judgment de novo. FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage in the proceedings we are required to "view all of the evidence in a light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." FindWhat, 658 F.3d at 1307. The entry of a protective order is reviewed only for abuse of discretion. Chrysler Int'l Corp. v. Chemaly, 280 F.3d 1358, 1360 (11th Cir. 2002).

## A.

Section 504 of the RA provides that "[n]o otherwise qualified individual

with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Regulations promulgated by the Department of Health and Human Services offer additional guidance regarding the statute's prohibition in this context. First, "[a] recipient hospital that provides health services or benefits shall establish a procedure for effective communication with persons with impaired hearing for the purpose of providing emergency health care." 45 C.F.R. § 84.52(c). Second, "[a] recipient . . . that employs fifteen or more persons shall provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question." 45 C.F.R. § 84.52(d)(1) (emphases added). These "auxiliary aids may include brailled and taped material, interpreters, and other aids for persons with impaired hearing or vision." 45 C.F.R. § 84.52(d)(3). "[A]ids, benefits, and services, to be equally effective, are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the

16

person's needs."  45 C.F.R. § 84.4(b)(2).

To recover compensatory damages under § 504, the Lieses must show that (1) IRMH violated their rights under § 504, and (2) that IRMH did so with discriminatory intent.  See Woods v. President & Trs. of Spring Hill Coll., 978 F.2d 1214, 1219 (11th Cir. 1992).  The "discriminatory intent" element raises two related legal questions: first, whether a defendant's deliberate indifference is sufficient to establish intentional discrimination under § 504 of the RA; and second, whether the conduct of the Hospital's medical personnel, including its doctors and nurses involved in treating Susan Liese, can be attributed to the defendant under § 504 of the RA.

## B.

We turn first to the issue of whether IRMH has violated the plaintiffs' rights under § 504.  The Lieses claim that IRMH failed to provide "appropriate auxiliary aids" in violation of the RA and 45 C.F.R. § 84.52(d)(1).

We begin with the obvious: the task of determining whether an entity subject to the RA has provided appropriate auxiliary aids where necessary is inherently fact-intensive.  See, e.g., Chisolm v. McManimon, 275 F.3d 315, 327 (3d Cir. 2001) ("Generally, the effectiveness of auxiliary aids and/or services is a question of fact precluding summary judgment."); Randolph v. Rodgers, 170 F.3d

17

850, 859 (8th Cir. 1999) (finding that whether a sign language interpreter was required under the RA is a question of fact inappropriate for summary judgment); Duffy v. Riveland, 98 F.3d 447, 454-56 (9th Cir. 1996) (concluding that whether qualified sign language interpreter was required under the Americans with Disabilities Act of 1990 is a question of fact inappropriate for summary judgment). Nonetheless, this does not mean that every request for an auxiliary aid that is not granted precludes summary judgment or creates liability under the RA. Thus, for example, as both parties agree, the simple failure to provide an interpreter on request is not necessarily deliberately indifferent to an individual's rights under the RA. Indeed, construing the regulations in this manner would effectively substitute "demanded" auxiliary aid for "necessary" auxiliary aid. Instead, the proper inquiry is whether the auxiliary aid that a hospital provided to its hearing-impaired patient gave that patient an equal opportunity to benefit from the hospital's treatment.

Whether a particular aid is effective in affording a patient an equal opportunity to benefit from medical treatment largely depends on context, including, principally, the nature, significance, and complexity of the treatment. For example, emergency surgery is often a complicated concept to convey to a person who can hear well; the attendant risks, manner of surgery, prognosis, and

18

advantages or disadvantages of immediate or postponed surgery can only complicate this communicative task.  Thus, under circumstances in which a patient must decide whether to undergo immediate surgery involving the removal of an organ under a general anesthetic, understanding the necessity, risks, and procedures surrounding the surgery is paramount.  Under these circumstances, auxiliary aids limited to written notes, body gestures, and lipreading may be ineffective in ensuring that a hearing-impaired patient receives equal opportunity to benefit from the treatment.[5]

In this case, IRMH medical personnel conducted a battery of tests on Liese and then removed her gallbladder through emergency laparoscopic surgery.  The auxiliary aids that the personnel relied on to communicate the nature of and need for the surgery consisted of mouthing words for the Lieses to try and lipread,

---

[5]  The Department of Justice ("DOJ") has suggested as much in its interpretation of regulations promulgated under the Americans with Disabilities Act of 1990 ("ADA"), tit. III, Pub. L. No. 101-336, 104 Stat. 327, 353 (codified as amended at 42 U.S.C. §§ 12181-12189), which concerns discrimination by places of public accommodation.  A DOJ regulation nearly identical to the RA regulations at issue in this case provides that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities."  28 C.F.R. § 36.303(c)(1).  In construing this provision in the medical context, the Department noted as an example that "an individual with a disability who is deaf or hard of hearing may need a qualified interpreter to discuss with hospital personnel a diagnosis, procedures, tests, treatment options, surgery, or prescribed medication (e.g., dosage, side effects, drug interactions, etc.)."  28 C.F.R. pt. 36, app. A.  Conversely, a person with the same disability "who purchases an item in the hospital gift shop may need only an exchange of written notes to achieve effective communication."  Id.

19

writing notes, and pantomiming.[6]  Viewed in a light most favorable to the Lieses, the record contains sufficient evidence to show that these limited auxiliary aids were ineffective and that additional aids were necessary.  At her deposition, Liese testified that she did not understand much of what she was purportedly told about her condition, prognosis, and proposed treatment by the attending emergency room personnel.  Liese did not understand the battery of tests that were conducted on her.  She said in her deposition that she repeatedly asked Dr. Perry why she was having gallbladder surgery when she was suffering from chest pains, not stomach pains, a question to which Dr. Perry apparently responded by writing a note that said, "remove it and you'll feel better after that."  Liese flatly asserted that the doctor "didn't tell me [or] explain anything."  In light of the major surgery required, under a general anesthetic, on an emergency basis, it seems to us fairly arguable that effective communication entails telling the patient more than that the proposed surgery will solve the problem.  We think a reasonable juror could find from these facts that IRMH failed to provide appropriate and necessary auxiliary aids to ensure that the Lieses received an equal opportunity to benefit from medical treatment.

---

[6] Even as to non-hearing-impaired patients, Dr. Perry remarked in his deposition that "[i]t is not infrequent for a patient . . . not to understand what the word laparoscopic means."

20

But such a failure by itself will not sustain a claim for compensatory damages; the Lieses must also show by a preponderance that the Hospital's failure to provide appropriate auxiliary aids was the result of <u>intentional</u> discrimination. See <u>Wood v. President & Trs. of Spring Hill Coll.</u>, 978 F.2d 1214, 1219 (11th Cir.1992). This Court has not yet determined what standard of proof a plaintiff must meet to demonstrate discriminatory intent under the RA. <u>See e.g.</u>, <u>T.W. ex rel Wilson v. Sch. Bd. of Seminole Cnty., Fla.</u>, 610 F.3d 588, 604 (11th Cir. 2010); <u>Bircoll v. Miami-Dade Cnty.</u>, 480 F.3d 1072, 1080-81 (11th Cir. 2007). Nor have we had occasion to address the issue of who within an organization must act with discriminatory intent. <u>See Doe v. Sch. Bd. of Broward Cnty., Fla.</u>, 604 F.3d 1248, 1254-1255 (11th Cir. 2010) (in Title IX context). We address these issues now.

C.

As an initial matter, our prior cases have suggested, without deciding between, two alternative standards for defining discriminatory intent: deliberate indifference and discriminatory animus. <u>See, e.g.</u>, <u>T.W.</u>, 610 F.3d at 604.

This Court has defined deliberate indifference in the RA context as occurring when "the defendant <u>knew</u> that harm to a federally protected right was substantially likely and . . . <u>failed</u> to act on that likelihood." <u>T.W.</u>, 610 F.3d at 604 (emphases added); <u>accord</u> <u>Loeffler v. Staten Island Univ. Hosp.</u>, 582 F.3d 268,

21

275 (2d Cir. 2009); Barber ex rel. Barber v. Colo. Dep't of Revenue, 562 F.3d 1222, 1228-29 (10th Cir. 2009); Duvall v. Cnty. of Kitsap, 260 F.3d 1124, 1139 (9th Cir. 2001).  As we have observed in another context, deliberate indifference plainly requires more than gross negligence.  See Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005) (per curiam) (discussing standard in medical needs claim brought under the Eighth Amendment).  Rather, deliberate indifference requires that the indifference be a "deliberate choice," Loeffler, 582 F.3d at 276, which is an "exacting standard," Doe, 604 F.3d at 1259.

Discriminatory animus, by contrast, requires a showing of prejudice, spite, or ill will.  See, e.g., Wood, 978 F.2d at 1218-19; see also Ferrill v. Parker Grp., Inc., 168 F.3d 468, 472-73 & n.7 (11th Cir. 1999) (defining "racial animus" as "ill will, enmity, or hostility").  Put differently, discriminatory animus is generally thought to be a combination of intentionally differential treatment and a disdainful motive for acting that way.  See Wood, 978 F.2d at 1220 (noting that "intentional discrimination" is a "lesser requirement" than "discriminatory animus").

Here, the Lieses argue that "deliberate indifference" is the appropriate standard for defining discriminatory intent.  The Hospital does not dispute this point on appeal.  Rather, it argues that the Lieses' claim fails as a matter of law even under a deliberate indifference standard.  We agree with the parties and hold

22

that a plaintiff may demonstrate discriminatory intent through a showing of deliberate indifference.

We begin by noting that all but one of our sister circuits to have addressed this issue have similarly concluded that a claim for compensatory damages under § 504 of the RA may be satisfied by a showing of deliberate indifference. See Meagley v. City of Little Rock, 639 F.3d 384, 389 (8th Cir. 2011) ("The district court decided that deliberate indifference was the appropriate standard for showing intentional discrimination in this type of case . . . . [W]e agree."); Duvall v. Cnty. of Kitsap, 260 F.3d 1124, 1138 (9th Cir. 2001) ("To recover monetary damages under Title II of the ADA or the Rehabilitation Act, a plaintiff must prove intentional discrimination on the part of the defendant . . . .  We now determine that the deliberate indifference standard applies." (citations and footnote omitted)); Powers v. MJB Acquisition Corp., 184 F.3d 1147, 1153 (10th Cir. 1999) ("[I]ntentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights."); Bartlett v. N.Y. State Bd. of Law Exam'rs, 156 F.3d 321, 331 (2d Cir. 1998) ("In the context of the Rehabilitation Act, intentional discrimination against the disabled does not require personal animosity or ill will . . . [it] may be inferred when a policymaker acted

23

with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the challenged policy . . . or custom." (internal quotation marks and alterations omitted)), vacated on other grounds, 527 U.S. 1031, 119 S.Ct 2388, 144 L.Ed.2d 790 (1999). But see Delano-Pyle v. Victoria Cnty., Tex., 302 F.3d 567, 575 (5th Cir. 2002) (rejecting deliberate indifference standard). However, since there has been little explication for the conclusion that intentional discrimination under the RA may be established by deliberate indifference, we add these thoughts.

To define discriminatory intent, we begin with the text of the RA as the starting point of statutory construction. See Southeastern Cmty. Coll. v. Davis, 442 U.S. 397, 405 (1979) (citing Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756 (1975) (Powell, J., concurring)). Section 504(a) of the RA states in pertinent part, "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). The only statutory remedy contained in the RA for a § 504 violation is a cross-reference to Title VI. Specifically, § 505(a)(2) of the RA provides that the "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of

24

1964 (42 U.S.C. 2000d et seq.) . . . shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under [section 504 of this Act]." 29 U.S.C. § 794a(a)(2). Thus, the text of the RA directs us to look to Title VI law to determine the scope of a plaintiff's remedies for § 504 violations.

Prior Supreme Court cases have established two principles regarding a claim for compensatory damages under Title VI and, thus, the RA. First, it is clear that private persons may sue to enforce Title VI's companion provision to § 504 of the RA under a judicially implied cause of action. Alexander v. Sandoval, 532 U.S. 275, 279-80 (2001) ("[P]rivate individuals may sue to enforce § 601 of Title VI and obtain both injunctive relief and damages."). Second, private individuals may recover compensatory damages under Title VI only in cases of intentional discrimination.[7] Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 607 n.27 (1983) (White, J.) (noting in an otherwise highly divided decision that a majority of the Justices "would not allow compensatory relief in the absence of proof of

---

[7] Justice White, writing for a fractured Court in Guardians, explained that Title VI, because it was passed under Congress's Spending Clause power, operates as a contract between the Federal government and recipients of Federal funding. See Guardians, 463 U.S. at 597-98. Drawing on an analogy to contract law, Justice White reasoned that a recipient should only be liable for money damages under the Court's judicially implied remedy in situations where the recipient knew that it was violating one of its obligations under Title VI. See id. Justice White then explained that such knowledge is presumed in cases of intentional discrimination. See id.

25

discriminatory intent" under Title VI); Sandoval, 532 U.S. at 282-83 ("In

Guardians, the Court held that private individuals could not recover compensatory

damages under Title VI except for intentional discrimination." (internal citations

omitted)).  The Supreme Court, however, has not given any guidance on what

"intentional discrimination" means in the context of either Title VI or the RA.

Thus, we expand the scope of our inquiry.

To resolve other ambiguities in the RA, the Supreme Court has also looked

to Title IX of the Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat.

373 (codified as amended at 20 U.S.C. §§ 1681-1688) for guidance. See Barnes v.

Gorman, 536 U.S. 181, 185-89 (2002) (looking to Title IX case law to delineate

the scope of private damages remedies available under the RA);  Consol. Rail

Corp. v. Darrone, 465 U.S. 624, 635-36 (1984) (looking to Title IX case law to

define the term "program or activity receiving Federal financial assistance" in the

RA).  Although the RA does not explicitly reference Title IX, Title IX case law is

nonetheless informative because of the striking similarities between Title IX and

the RA.  Title IX, like the RA, was modeled after Title VI, and the text of all three

acts are virtually identical; the prohibitions contained in each statute vary only by

the type of discrimination that is forbidden.[8]

Also significant is that the three statutes share the same Constitutional foundation: Congress enacted all three pursuant to its powers under the Spending Clause, U.S. Const., art. I, § 8, cl. 1.  As the Supreme Court has noted, Spending Clause legislation is analogous to a contract between the federal government and recipients of federal funds.  See Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17 (1981) ("[L]egislation enacted pursuant to the spending power is much in the nature of a contract . . . .").  Accordingly, the Court has applied the same contract-law analogy to define the scope of private damages remedies available

---

[8] Compare Civil Rights Act of 1964 § 601, 42 U.S.C. § 2000d:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance,

with Education Amendments of 1972 § 901, 20 U.S.C. § 1681(a):

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ,

and Rehabilitation Act of 1973 § 504, 29 U.S.C. § 794(a):

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

under the RA, Title VI, and Title IX.  See Barnes, 536 U.S. at 186-88 ("[W]e have regularly applied the contract-law analogy in cases defining the scope of conduct for which funding recipients may be held liable for money damages . . . .  The same analogy applies, we think, in determining the scope of damages remedies.").

Thus, we think it appropriate to look to the Supreme Court's Title IX case law for some guidance in defining the term "discriminatory intent" for purposes of the RA.[9]  Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274 (1989), a Title IX case, is particularly instructive.  There, the Supreme Court held that, like in Title VI cases, a plaintiff suing for money damages must demonstrate discriminatory intent, which a plaintiff may establish by showing deliberate indifference.  The Court reached this holding by analyzing the purpose of Title IX as well as its express remedial structure.  It first observed that, because the private right of action under Title IX is judicially implied, it has "a measure of latitude to shape a sensible remedial scheme that best comports with the statute."  See Gebser, 524 U.S. at 284.  The Court noted that the text of the statute itself gave little guidance on the matter, and so the Court looked to the purpose of Title IX and the scope of

---

[9]  To be sure, we do not hold that Title IX and Title VI case law should be automatically imputed to the RA.  See Alexander v. Choate, 469 U.S. 287, 294 n.7 (1985) ("[T]oo facile an assimilation of Title VI law to § 504 must be resisted.").  Nevertheless, Title IX law is instructive in situations where the Supreme Court's reasoning naturally applies with equal force to the RA.

28

Title IX's express remedy to infer congressional intent.

As for purpose, the Court observed that Congress enacted Title IX with two principal objectives in mind: "[T]o avoid the use of federal resources to support discriminatory practices" and "to provide individual citizens effective protection against those practices." Gebser, 524 U.S. at 286 (quoting Cannon v. Univ. of Chicago, 441 U.S. 677, 704 (1979)). Nevertheless, because Congress enacted Title IX under its Spending Clause power, the Court's implied right should not allow for money damages against recipients who are not aware that they are violating Title IX. See Gebser, 524 U.S. at 287 (citing Guardians, 463 U.S. at 596-603). The deliberate indifference standard, the Court reasoned, meets the objectives of Title IX while providing the requisite notice to federal funds recipients because it requires that the recipient know of its discriminatory action and deliberately refuse to act on that knowledge. See id. at 290.

The Court also explained that the scope of Title IX's implied remedy should not exceed the scope of Title IX's express remedy. Id. at 288-90 ("[I]t would be anomalous to impute to Congress an intention to expand the plaintiff class for a judicially implied cause of action beyond the bounds it delineated for comparable express causes of action." (quoting Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 180 (1994) (internal quotation

29

marks omitted))).  Title IX's express remedy -- an enforcement proceeding brought by an administrative agency against entities that are in violation of Title IX -- is limited by the twin requirements that the defendant-entity had actual notice that it was in violation of Title IX and had an opportunity to rectify the violation. See 20 U.S.C. § 1682; Gebser, 524 U.S. at 290.  The deliberate indifference standard, the Court suggested, was a "rough parallel" to the express remedy's notice-and-opportunity requirements.  Gebser, 524 U.S. at 290.

Because of the similarities between Title IX and the RA, Gebser's purpose-and-scope reasoning applies with similar force to the RA and yields the same result.  The two principal purposes of Title IX that were outlined in Gebser -- to avoid the use of Federal funds to support discriminatory practices and to protect citizens against discriminatory practices -- are shared by §504 of the RA.  See S. Rep. 93-1297, at 1 (1974), reprinted in 1974 U.S.C.C.A.N. 6373, 6390-91.  The legislative history of the RA also shows that Congress intended for § 504 to combat intentional discrimination in general, not just discrimination resulting from "invidious animus."  See Alexander v. Choate, 469 U.S. 287, 295 (1985). Additionally, like Title IX, Congress enacted the RA under its Spending Clause power.  Thus, we are presented with the same balancing act that the Supreme Court faced in Gebser.  Since the scales are loaded with the same set of interests as

30

in Gebser, we are inclined to reach the same result: The deliberate indifference standard best reflects the purposes of § 504 while unambiguously providing the notice-and-opportunity requirements of Spending Clause legislation.  A lower standard would fail to provide the notice-and-opportunity requirements to RA defendants, while a higher standard -- requiring discriminatory animus -- would run counter to congressional intent as it would inhibit § 504's ability to reach knowing discrimination in the absence of animus.  See Alexander, 469 U.S. at 295.

Moreover, application of the deliberate indifference standard does not exceed the scope of express remedies available for § 504 violations.  While the RA itself does not contain any express remedies for § 504 violations, again, it expressly incorporates Title VI's remedies.  See 29 U.S.C. § 794a(a)(2).  Title VI's remedial scheme, which mirrors Title IX's, also empowers administrative agencies to bring enforcement proceedings against entities.  See 42 U.S.C. §2000d-1.  The notice-and-opportunity requirements in Title VI administrative enforcement proceedings are the same as those found in Title IX.  See id.  The deliberate indifference standard is fully consonant with these notice-and-opportunity requirements.

In light of the parties' agreement about the appropriate standard, the

31

overwhelming body of circuit case law, and our review of the pertinent analogs, we have little difficulty in applying deliberate indifference to this case.

D.

The remaining essential legal question in this RA claim is whether the deliberate indifference of IRMH's medical personnel can be attributed to the Hospital so that IRMH can fairly be said to have acted with deliberate indifference. There are two possible ways to impute liability in this case: respondeat superior or the narrower approach adopted by the Supreme Court in Gebser. See 524 U.S. at 287-90. Neither party has properly placed before this Court the issue of which standard applies.[10] Instead, both parties approvingly cite to Gebser, which flatly rejects the use of respondeat superior and constructive notice principles. See 524 U.S. at 287-88. We agree that Gebser provides the correct standard. Gebser's analysis of what constitutes discriminatory intent (detailed supra) is inseparably linked to the question of whose discriminatory

---

[10] The plaintiffs' mention of vicarious liability as an appropriate standard in one sentence in their reply brief constitutes a waiver of this argument. See Conn. State Dental Ass'n v. Anthem Health Plans, Inc., 591 F.3d 1337, 1351 n.11 (11th Cir. 2009) ("Because they raised this argument for the first time in their reply brief, we treat this argument as waived."). We need not determine the applicability of such a standard as a result, but we do note that several circuits have found respondeat superior liability to apply to suits brought under the Rehabilitation Act. See Delano-Pyle v. Victoria Cnty., Tex., 302 F.3d 567, 574-75 (5th Cir. 2002); Duvall v. Cnty. of Kitsap, 260 F.3d 1124, 1141 (9th Cir. 2001); Rosen v. Montgomery Cnty. Md., 121 F.3d 154, 157 n.3 (4th Cir. 1997); see also Patton v. Dumpson, 498 F. Supp. 933, 942-43 (S.D.N.Y. 1980).

32

intent may be attributed to IRMH for purposes of establishing liability. Thus, the same reasoning that led us to adopt Gebser's deliberate indifference standard also leads us to adopt its analysis of attribution.

For an organization to be liable for Title IX purposes, Gebser requires the deliberate indifference of "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [organization's] behalf [and who] has actual knowledge of discrimination in the [organization's] programs and fails adequately to respond." Gebser, 524 U.S. at 290 (emphases added). The parties differ here, however, on who an "official" is, and neither the Supreme Court nor our Court has had occasion to address this issue. The Lieses say that every single employee of the staff who knew of the Lieses' impairment and had the authority to provide the Lieses with an interpreter is an official within the meaning of Gebser. IRMH argues that Gebser requires the deliberate indifference of an IRMH "policy maker" -- that is, someone capable of making an official decision. We think neither interpretation appropriately describes the Gebser standard.

The Lieses' interpretation essentially eviscerates the requirement that there be a decision by an official. Gebser did not define an official to be a person who has knowledge of a violation and the authority to correct it; rather, Gebser stated

33

that, for liability to attach, there must be (1) "an official" who, (2) "at a minimum,"
has the requisite knowledge and authority.  See Gebser, 524 U.S. at 290.  In other
words, Gebser's requirement that there be an official is distinct from its
requirement that the official have the knowledge of and authority to correct an
entity's discriminatory practices.

IRMH's interpretation, on the other hand, adds a requirement that is not
found in the Gebser standard.  Nowhere in the language of  Gebser does the Court
indicate that only those who are authorized to set an entity's policy may be
officials.[11]  Entities regularly undertake a myriad of official actions that do not
involve policymaking.  Likewise, an entity may have an official representative --
for example, a corporate spokesperson -- who does not have policymaking
authority.

A natural reading of Gebser reveals that the purpose of the "official"
requirement is to ensure that an entity is only liable for the deliberate indifference
of someone whose actions can fairly be said to represent the actions of the
organization.  See Gebser, 524 U.S. at 290 ("The premise, in other words, is an

---

[11]  IRMH cites to an unpublished case, Saltzman v. Bd. of Comms. of N. Broward Hosp.
Dist., 239 F. App'x 484 (11th Cir. 2007), for the proposition that only those with policy-making
power can be officials.  While Saltzman uses "policymaker" and "official" interchangeably, the
case clearly defines policymaker merely as someone "capable of making an 'official decision' on
behalf of the organization.'" See id. at 488.  Thus, Saltzman does not support IRMH's
proposition that an official must be someone who is able to set company policy.

34

official decision by the recipient not to remedy the violation."); Doe v. Sch. Bd. of Broward Cnty., Fla., 604 F.3d 1248, 1255 (11th Cir. 2010) (commenting that an official must be someone "high enough up the chain-of-command that his acts constitute an official decision . . . not to remedy the misconduct" (quoting Floyd v. Waiters, 171 F.3d 1264, 1264 (11th Cir. 1999))). The question of how far up the chain of command one must look to find an "official" is necessarily a fact-intensive inquiry, since an official's role may vary from organization to organization. See Doe, 604 F.3d at 1256-57. In the § 504 context, we conclude that an official is someone who enjoys substantial supervisory authority within an organization's chain of command so that, when dealing with the complainant, the official had complete discretion at a "key decision point" in the administrative process. See Doe, 604 F.3d at 1256-57. The "key decision point" language reflects the practical reality that, while some decisions are technically subject to review by a higher authority, such a review is not part of the entity's ordinary decision-making process. See id.

In the present case, a reasonable juror could conclude from this record that the doctors at IRMH were officials within the meaning of Gebser. Viewed in a light most favorable to the Lieses, the record shows at least that the doctors had complete discretion to decide whether or not to provide the Lieses with an

35

interpretive aid.  While any Hospital staff member, be it a doctor or a nurse, had the authority to ask for an interpreter or to retrieve the Hospital's MARTTI video interpreting system from the storage closet, on this record the evidence suggests strongly that the doctors had supervisory authority.  Indeed, the doctors could overrule a nurse's decision to not provide an auxiliary aid.  In contrast, there is no evidence here to suggest that the doctors' decisions were subject to reversal.  Thus, unlike the nurses, the doctors enjoyed complete discretion over whether or not to provide the Lieses' with an interpreter or other auxiliary aid.

A review of IRMH's "Communication Barriers" policy confirms this arrangement.  The policy provides that interpretive aids, such as interpreters and the MARTTI video interpreting system, are all "available" to provide assistance in communicating with patients.  However, the policy offers no guidance or recommendation as to when doctors or nurses should use these aids; rather, it affords the IRMH staff complete discretion in these matters.  Similarly, the training that IRMH provided to its staff on MARTTI dealt exclusively with how to use MARTTI, not when to use it.

We add that Dr. Perry averred in his deposition that, over the last 17 years (which includes the time of the Lieses' treatment), he had been the chairman of IRMH's Department of Surgery, the vice-chairman before that, and that he was

36

also a member of IRMH's Medical Executive Committee. Taking these facts in a light most favorable to the Lieses, a reasonable juror could conclude that Dr. Perry had supervisory authority even beyond that of other IRMH doctors during the time of Susan Liese's treatment.

E.

Having established that the summary judgment record supports a reasonable finding that IRMH failed to provide Susan Liese with necessary and appropriate auxiliary aids in violation of § 504 and 45 C.F.R. § 84.52(d)(1), and having outlined the meaning of "discriminatory intent," we turn finally to whether a jury could reasonably find that the Hospital acted with deliberate indifference. For the Lieses' claim to survive summary judgment, a reasonable juror must be able to find that at least one of IRMH's doctors (1) knew that IRMH had failed to provide Susan Liese with appropriate auxiliary aids necessary to ensure effective communication (the § 504 violation), (2) had the authority to order that aid be provided, and (3) was deliberately indifferent as to IRMH's failure to provide aid. We think the record, again viewed in a light most favorable to the Lieses, could support such a finding.

The record provides ample evidence that the conduct of Dr. Perry met all three of these essential elements. Susan Liese testified that, on the day before her

37

surgery, she had told Dr. Perry that her ability to read lips was limited.  Liese further recounted that Dr. Perry "laughed at" her and made exaggerated facial movements when asking whether she could read lips.  Moreover, Liese had told Dr. Perry at least twice that she needed an interpreter and both times Dr. Perry ignored her request.  Moreover, when Dr. Perry began explaining that she needed to have her gallbladder removed, Liese asked why she was having surgery on her stomach when she was experiencing chest pain.  Dr. Perry's response to this question was to write down, "remove it and you'll feel better."  The next day, on the morning of her surgery, Liese repeated her request for an interpreter and again asked why she needed the surgery.  A reasonable juror could well find from these facts that Dr. Perry knew that he was not effectively communicating with Liese, despite his attempts at pantomime, and that Liese needed more substantive interpretive aids to understand the nature of and need for her surgery.[12]

As for the second and third elements, it is undisputed that Dr. Perry had the authority to obtain an interpreter or some other equivalent for Susan Liese.  Thus, he clearly had the authority to remedy the failure.  It is also undisputed that Dr.

---

[12]  To be sure, a reasonable juror could also find that the doctors honestly believed that Susan Liese did not need any interpretive aid.  In fact, as we have noted, Dr. Perry testified that Susan Liese never asked for an interpreter.  However, this is an issue of material fact to be resolved at trial, not on summary judgment.

38

Perry never made any attempt to obtain any interpretive aid for Susan Liese. His apparent knowledge that Liese required an additional interpretive aid to effectively communicate with him and his deliberate refusal to provide that aid satisfies the deliberate indifference standard.

On this point, IRMH argues nevertheless that it should not be liable for the actions of its employees because it had set forth a policy for effective communications. This argument is unconvincing, however, because IRMH's policies did not provide any guidelines, requirements, or even recommendations about when or whether the Hospital staff should provide auxiliary aids; the "Communication Barriers" policy merely stated that auxiliary aids are "available." Thus, as we've noted, IRMH delegated complete discretion to its staff.

In sum, taking the evidence in a light most favorable to the nonmoving party, a reasonable juror could find that Dr. Perry made an "official decision" for IRMH with regard to the provision of auxiliary aids. Dr. Perry arguably knew that IRMH had failed to provide the Lieses with appropriate aids that were necessary to ensure effective communication, indisputably had the unfettered authority and ability to institute corrective measures, and decided not to remedy this failure. This is enough to infer intentional discrimination and thus state a claim against IRMH under § 504 of the Rehabilitation Act.

39

III.

The plaintiffs also cite several additional grounds of error.[13]  First, Susan Liese says that the district court improperly granted summary judgment to the Hospital on her negligent infliction of emotional distress claim.  Second, both Lieses claim that the district court abused its discretion by entering a protective order limiting their discovery of two nonparty doctors.  We are unpersuaded by either argument.

A.

The first issue presents a pure question of law and arises from the district court's grant of summary judgment; we review it de novo.  FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011).    The district court correctly concluded that, because a hospital has no duty to obtain informed consent under Florida law, it cannot be held liable for negligent infliction of

---

[13]  The Lieses argue that the district court erroneously excluded the Fisher settlement under Fed. R. Evid. 408.  We need not resolve the admissibility of the prior settlement.  Even if it were inadmissible, the plaintiffs have put forth other sufficient evidence of material issues of fact to merit trial on whether medical personnel were deliberately indifferent to requests for interpretive services necessary for effective communication and, if so, whether those individuals could bind IRMH insofar as they had the necessary authority to decide whether to provide accommodations.  The plaintiffs need not rely on an indirect method of proof to establish knowledge if the finder of fact otherwise determines that the Lieses' accounts are to be credited and that the medical personnel had the requisite knowledge and authority to accommodate the Lieses.  This is enough to survive a motion for summary judgment.  We offer no view about how the district court should rule on the Fisher settlement issue.

40

emotional distress for its failure to obtain Liese's consent before operating.  See

Cedars Med. Ctr., Inc. v. Ravelo, 738 So. 2d 362, 366-67 (Fla. 3d Dist. Ct. App.

1999) (concluding that hospitals have no duty to obtain a patient's informed

consent); Yocom v. Wuesthoff Health Sys., Inc., 880 So. 2d 787, 790 (Fla. 5th

Dist. Ct. App. 2004) (same).

However, Liese does not contest the district court's ruling insofar as it is

based upon informed consent.  Rather, she argues that there are two additional

sources of duty that keep her negligent infliction of emotional distress claim

viable: (1) the RA, its regulations, and the ADA; and (2) "the general facts of the

case," which create a duty under some inchoate common-law principle governing

claims of negligent infliction of emotional distress.[14]

Neither the Rehabilitation Act, its regulations, nor the ADA create a

negligence duty under Florida law in this case.  Although Florida allows a statute

to be used as evidence of negligence in some circumstances, e.g., Fla. Dep't of

---

[14]  The district court did not address either of these theories in granting summary judgment.  Instead, the district court reasoned that the negligent infliction of emotional distress claim in its entirety was "predicated" on the informed consent claim.  These two theories were also raised in Liese's opposition to IRMH's motion for summary judgment.  We address them on appeal because their validity raises a question of law, and it would only further expend judicial resources first to remand them to the district court for analysis.  See Exxon Shipping Co. v. Baker, 554 U.S. 471, 487 (2008) (citing Singleton v. Wulff, 482 U.S. 106, 120 (1976)); Ochran v. U.S., 117 F.3d 495, 502-03 (1997).  Since these claims fail as a matter of Florida law, we have no occasion to determine whether they would otherwise be preempted under federal law.

41

Corr. v. Abril, 969 So. 2d 201, 205 (Fla. 2007), Liese's argument that the breach of a duty by IRMH is "apparent by virtue of the Plaintiff's rights under the Rehabilitation Act and the regulations under the Rehabilitation Act, or the similarly interpreted Americans with Disabilities Act," is insufficient to state a claim under Florida law.  To be sure, Florida law provides that a statutory or regulatory violation can, in some cases, impose strict liability on the violator, constitute negligence per se, or serve as evidence of negligence.  See deJesus v. Seaboard Coast Line R.R. Co., 281 So. 2d 198, 200-01 (Fla. 1973).  Strict liability is imposed for statutory or regulatory violations only if the provision is of "the type designed to protect a particular class of persons from their inability to protect themselves, such as one prohibiting the sale of firearms to minors."  Id. at 201 (citing Tamiami Gun Shop v. Klein, 116 So. 2d 421 (Fla. 1959)).  Plainly, the provisions here are not of this kind.

Liese's showing was also insufficient to withstand summary judgment under either a negligence per se or evidence of negligence theory.  A negligence per se claim would be appropriate under Florida law when there is a violation of a "statute which establishes a duty to take precautions to protect a particular class of persons from a particular injury or type of injury."  Id.  Additionally, a plaintiff pursuing a negligence per se claim must also establish that she "is of the class the

42

statute was intended to protect, that [s]he suffered injury of the type the statute was designed to prevent, and that the violation of the statute was the proximate cause of h[er] injury." Id.; see also 1 Matthew Bender, Florida Torts § 1.05[1][b] (Release No. 45 Sept. 2011) ("[O]ne must allege either that Florida courts have recognized the violation of a particular statute or ordinance as constituting negligence per se, or that the applicable statute or ordinance was specifically enacted to protect a specific class of persons from a particular harm."). Liese has failed to meet these requirements. None of Liese's filings with the district court do more than vaguely assert that the RA, its regulations, or the ADA creates a duty of effective communication, and that IRMH's violation of this duty somehow supports a negligent infliction of emotional distress claim under Florida law.

Nor did Liese's filings -- which remained ambiguous as to the federal law or regulations at issue even through her motion opposing summary judgment -- ever establish a sufficiently specific duty to allow relief under an evidence of negligence theory. See Murray v. Briggs, 569 So. 2d 476, 481 (Fla. 5th Dist. Ct. App. 1990) ("At the very least, any regulation that purports to establish a duty of reasonable care must be specific. One that sets out only a general or abstract standard of care cannot establish negligence." (citations omitted)). Merely citing to federal disabilities statutes as a whole or asserting that IRMH had a general

43

duty to provide effective communication is insufficient under Florida law to state a negligence claim predicated upon the violation of a statute or regulation.[15]  Cf. id. at 480-81 (declining to use federal regulation that was "vague and general" to "control state law questions of negligence by enlarging common law duties or creating new duties").

Liese also relies upon McCain v. Florida Power Corp., 593 So. 2d 500 (Fla. 1992), which offers the unremarkable proposition that "Florida, like other jurisdictions, recognizes that a legal duty will arise whenever a human endeavor creates a generalized and foreseeable risk of harming others," id. at 503.  The contours of such a duty as applied in this context are not discussed by Liese, nor could they be: the only possible duties that could be placed on IRMH are to obtain the informed consent of the patient before operating or to provide certain communicative aids to the hearing impaired.  This argument fails because those duties fail as a matter of law for the reasons we have already discussed.

## B.

The Lieses also challenge the entry of a protective order by the district court in favor of Drs. Brown and Ulrich, the Lieses' former primary care practitioners

---

[15]  Liese also seems to argue that the Fisher settlement created a duty that IRMH breached.  However, the mere creation of a contractual duty between IRMH and another party does not also create a tort duty between IRMH and Liese.

44

and nonparties to this lawsuit.  We review the entry of a protective order for abuse

of discretion.  Chrysler Int'l Corp. v. Chemaly, 280 F.3d 1358, 1360 (11th Cir.

2002).  Indeed, "[t]he trial court . . . is given wide discretion in setting the limits of

discovery, and its judgment will be overturned only when a clearly erroneous

principle of law is applied or no evidence rationally supports the decision."

Farnsworth v. Procter & Gamble Co., 758 F.2d 1545, 1547 (11th Cir. 1985)

(citation omitted).  The district court did not abuse its discretion.

Dr. Brown appeared for a deposition initiated by counsel for the Hospital's

surgeons on August 2, 2010.  The cross-examination by plaintiffs' counsel began

with the discharge of the Lieses -- that is, the termination of their doctor-patient

relationships -- by Dr. Brown's practice, Primary Care of the Treasure Coast.

Very soon thereafter, however, the Lieses' counsel began an inquiry into the scope

and size of Dr. Brown's practice, including whether he had ever obtained a sign-

language interpreter for a patient and his knowledge of  how to get an interpreter.

Dr. Brown was not represented at the deposition and demanded the presence of an

attorney before he would answer any further questions.  Based on Dr. Brown's

deposition testimony, the Lieses sought leave to amend their complaint to include

new claims against IRMH for retaliatory discharge under the ADA, and for

interference by IRMH with the Lieses' business relationships because Dr. Brown

45

had dropped the Lieses as patients for filing this suit against IRMH.[16]  The Lieses

also filed a complaint with the Department of Justice against Primary Care of the

Treasure Coast for retaliation pursuant to 42 U.S.C. § 12203.   The district court

denied the Lieses' leave to amend as untimely, and the magistrate judge further

granted a protective order to Drs. Brown and Ulrich.  The magistrate judge

determined that any inquiry into the "business practices of non-parties or other

individuals" and "how these doctors may or may not have been able to

communicate with other patients" was irrelevant.  The magistrate judge also said

that whether other individuals were patients of either doctor was confidential and

that the only relevant inquiry was "how individuals and/or health care providers

communicated with the Plaintiffs."  The district court affirmed the entry of this

protective order.

Federal  Rule of Civil  Procedure 26(b)(1) provides that the scope of

discovery includes "any nonprivileged matter that is relevant to any party's claim

or defense."  A district court may, for good cause, issue a protective order "to

protect a party or person from annoyance, embarrassment, oppression, or undue

---

[16]  The record filed on appeal does not appear to contain the portion of Dr. Brown's deposition testimony that formed the basis of the Lieses' allegation that Dr. Brown discharged the Lieses in retaliation for filing this suit, nor are the merits of this allegation before us.  We express no opinion on this allegation and include it solely to provide background for the district court's entry of the protective order.

burden or expense." Fed. R. Civ. P. 26(c)(1). Such an order may "forbid[] inquiry into certain matters, or limit[] the scope of disclosure or discovery to certain matters." Fed. R. Civ. P. 26(c)(1)(D). As the Advisory Committee Notes say, "[t]he Committee intends that the parties and the court focus on the actual claims and defenses involved in the action." Fed. R. Civ. P. 26 advisory committee's note (2000 Amendment). In other words, "the court . . . has the authority to confine discovery to the claims and defenses asserted in the pleadings, and . . . the parties . . . have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings." Id.

The Lieses' argument is founded on the notion that the proposed cross-examination would have demonstrated that Dr. Brown was not credible and that he was biased because of financial considerations (both his own and IRMH's), in addition to the doctors' risk of future litigation. This argument is flawed. The core of the Lieses' argument is that United States v. Garcia, 13 F.3d 1464 (11th Cir. 1994), stands for the proposition that a court abuses its discretion if "a reasonable jury would have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination." Id. at 1469. The context of this quotation demonstrates the limits of this argument:

> As previously noted, "[t]he Sixth Amendment does not require unlimited inquiry into the potential bias of a witness." The test for the Confrontation Clause is whether a reasonable jury would have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination.

Id. (citation omitted). This civil case contains no Confrontation Clause issue. Rather, the appropriate inquiry is whether further examination of the practices of the medical clinic is "relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). It is not. As the district court and magistrate judge correctly observed, the proper inquiry is how the doctors interacted with the Lieses during their treatment at IRMH. What the doctors' business practices or treatment of other patients consisted of was irrelevant to determining IRMH's liability in this case. The doctors' reasons for dropping the Lieses as patients following this lawsuit are similarly irrelevant.

Moreover, the plaintiffs appear to have misinterpreted the scope of the protective order, claiming that they could not cross-examine Dr. Brown about his memory with regard to the Lieses' treatment or how he interacted with the Lieses on previous occasions. The protective order only limits examination concerning other patients, the doctors' business practices, and the doctors' subsequent termination of the Lieses as patients; it does not limit examination in any way regarding how the doctors' interacted with the Lieses during the course of their

48

treatment at IRMH or during any of their previous treatments.[17]  In short, the district court did not abuse its discretion in entering a protective order.

IV.

In sum, the Lieses have presented a sufficient factual foundation that, if credited, would allow a reasonable jury to conclude that medical personnel with the necessary decision-making authority to bind IRMH were deliberately indifferent to the Lieses' rights under the Rehabilitation Act.  There is enough here to warrant a trial on the § 504 RA claim.  However, the district court appropriately granted summary judgment to IRMH on Susan Liese's negligent infliction of emotional distress claim, and it did not abuse its considerable discretion in entering a protective order.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

[17]  The order states in relevant part:

> Based upon the foregoing findings, this Court finds that the [doctors] are entitled to a protective order. Questions to them should be limited to the doctors' interactions and communications with the Plaintiffs. Any inquiry into business practices of either of these doctors or how they may have communicated with other patients is strictly prohibited by this Order. Further, based upon the pleadings thus framed, there shall be no inquiry into any reasons or issues concerning why these Plaintiffs may have been terminated as patients by either of these doctors.