[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 16-10980, 16-13327

_____

D.C. Docket No. 9:13-cv-80685-DTKH

SANDRA SUNDERLAND,
BODIL TVEDE,
JAMES LIESE,
SUSAN LIESE,
CAROLANN DONOFRIO,
JOHN DONOFRIO,
JACQUELINE GLUCKMAN,
BARBARA DRUMM,
JOHN VIRGADAULA,
THE FLORIDA ASSOCIATION OF THE DEAF, INC.,

Plaintiffs - Appellants,

versus

BETHESDA HOSPITAL, INC.,
d.b.a. Bethesda Memorial Hospital,
d.b.a. Bethesda Hospital West,
BETHESDA HEALTH, INC.,

Defendants - Appellees.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(April 27, 2017)

Before WILSON and BLACK, Circuit Judges, and RESTANI,[*] Judge.

WILSON, Circuit Judge:

Nine deaf hospital patients and the Florida Association of the Deaf[1] appeal

the district court's dismissal at the summary judgment stage of their disability

discrimination claims against Bethesda Hospital. The patients and the Association

allege that Bethesda failed to provide the patients with the basic accommodation

required for a deaf individual to equally access hospital services: an interpretive

aid that allows the individual to communicate effectively with hospital staff. The

patients seek compensatory damages under Section 504 of the Rehabilitation Act,

and both the patients and the Association seek injunctive relief under Section 504

and the Americans with Disabilities Act (ADA).

After careful review of the parties' briefs and the record, and having had the

benefit of oral argument, we affirm in part and reverse in part. We reverse and

remand the district court's grant of summary judgment to Bethesda on Sandra

_____

[*] Honorable Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.
[1] The Association is a membership organization which promotes the interests of hearing-impaired individuals in Florida.

2

Sunderland's, James Liese's, Susan Liese's, John Virgadaula's, and Jacqueline Gluckman's Section 504 claims for compensatory damages. We also reverse and remand the district court's dismissal on standing grounds of Ms. Gluckman's and the Association's Section 504 and ADA claims for injunctive relief. We affirm the remainder of the district court's findings.

## I. BACKGROUND[2]

In 2006, Bethesda entered a settlement agreement with the Department of Justice after a complaint was filed with the Department alleging discrimination against deaf patients. *See Bethesda Mem'l Hosp.*, D.J. No. 202-18-178 (Settlement Agreement May 5, 2006), https://www.ada.gov/bethesda.htm. The agreement required Bethesda to take certain steps to ensure effective communication with deaf patients. *See id.* For several years after the agreement, Bethesda primarily relied on in-person interpreters to accommodate deaf patients. But in 2011 it began using a Video Remote Interpreting device (VRI) to communicate with deaf patients. The VRI allows patients to videoconference with an interpreter who is located remotely.

Bethesda has a written policy for the VRI:

> For the purpose of rendering emergency health care, the Hospital provides . . . [a VRI] Computer on Wheels. . . . The [VRI] . . . is stored in the Nursing Supervisor's

---

[2] In this section, we construe in the light most favorable to the patients the facts that are relevant to their compensatory-damages claims. *See McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1141 (11th Cir. 2014).

office and will be brought to the area requesting the unit by the Nursing Supervisor. . . . In those circumstances where VRI does not accommodate patient need[s,] the nursing administrative supervisor and[/]or risk management will be contacted to assist with providing an alternative communication mode such as [an in-person interpreter].

Bethesda's nurses and Nursing Supervisors administer this policy, while Bethesda's Vice President for Risk Management ensures compliance with the policy. A deaf patient's nurse is responsible for determining whether to provide the patient the VRI or a less-substantive interpretive aid. If the nurse finds that the VRI is necessary, the nurse requests the VRI and the on-duty Nursing Supervisor transports the VRI to the patient's room. Once the VRI is in the patient's room, the nurse is responsible for assessing whether the VRI is accommodating the patient's needs. To address deficiencies with the VRI, the nurse can take corrective measures, such as obtaining assistance from technical-support personnel or communicating through written materials. In most situations, only if a nurse finds that the VRI is not accommodating the patient will the patient be able to access an in-person interpreter. When a nurse finds that an in-person interpreter is needed, the Nursing Supervisor is tasked with seeking approval from a hospital administrator for the interpreter. Other than transporting the VRI upon a nurse's request and seeking approval for an in-person interpreter, the Nursing Supervisor has limited involvement with the process for accommodating a deaf patient.

4

Soon after Bethesda started using the VRI, various hospital personnel received reports of patient difficulties with the VRI. Dorothy Kerr, one of Bethesda's Nursing Supervisors, and Gary Ritson, Bethesda's Vice President for Risk Management, were informed of a few instances in which the VRI malfunctioned. Ritson also was informed that several patients refused to use the VRI and demanded an in-person interpreter. In response to this information, Ritson posted a sign in the hospital stating that patients who prefer an in-person interpreter rather than the VRI must pay for the interpreter. Finally, the Association met with Bethesda's President to relay certain Association members' complaints about the VRI.

The patients in this case, Sandra Sunderland, Barbara Drumm, James Liese, Susan Liese, John Virgadaula, Jacqueline Gluckman, Carolann Donofrio, John Donofrio, and Bodil Tvede, each visited Bethesda after Bethesda began using the VRI.

## A. Sandra Sunderland

Ms. Sunderland, who is around 70 years old, had a heart attack in 2012 and spent two weeks at Bethesda. During the stay, Ms. Sunderland had a cardiac catheterization procedure. Ms. Sunderland asked a nurse for an in-person interpreter prior to the procedure, but the nurse denied the request. And the nurse did not provide Ms. Sunderland with the VRI. Consequently, the doctor who

performed the procedure used neither the VRI nor an in-person interpreter when communicating with Ms. Sunderland prior to the procedure. The doctor relied solely on gesturing. Ms. Sunderland in her deposition reported that she was confused about the procedure and was "scared to death" in the moments leading up to it: "[Hospital staff] didn't tell me anything. . . . [N]othing was explained. I was just laying there scared to death and . . . I was like, 'Huh, what's going on here? Where is my interpreter?'"

While recovering in the hospital from the procedure, Ms. Sunderland developed a hematoma and was sent to the intensive care unit. She was placed on a ventilator and was sedated for a few days. When she woke up, a nurse provided her information about her medication and its side effects, but her comprehension of the information was "questionable."

On the fifth day of her admission, Ms. Sunderland again asked a nurse for an in-person interpreter. The nurse denied the request but afforded Ms. Sunderland access to the VRI. For the remainder of Ms. Sunderland's hospital stay, the VRI was used intermittently. The VRI, however, frequently froze and was blurry. Ms. Sunderland's son complained to a nurse about these issues and requested an in-person interpreter. No in-person interpreter was provided.

Ms. Sunderland lives near Bethesda. She suffers from several heart conditions and has a depressive disorder. A medical expert testified in a deposition

that Ms. Sunderland, due to her heart conditions, "eventually will go back to the hospital," but "[t]he timing of that is unpredictable."

## B. Barbara Drumm

Ms. Drumm is around 80 years old and visited Bethesda once in 2012 and once in 2013. In 2012, she was admitted to Bethesda for multiple days for back pain. During the first few days of her stay, hospital staff used pen and paper to communicate with her and the final day, used the VRI. Ms. Drumm complained during her stay about the limited access she had to hospital staff, but she did not otherwise complain about communication difficulties. Ms. Drumm's 2013 visit to Bethesda was for chest pain. She communicated with pen and paper and the VRI during the visit.

Ms. Drumm lives near Bethesda and is a member of the Association. She intends to return to Bethesda at some point, but she has no procedures scheduled and her health is stable.

## C. James and Susan Liese

James and Susan Liese are married and are both in their 80s. Mr. Liese visited Bethesda three times in 2011, and Mrs. Liese accompanied him on all three occasions.[3]

---

[3] Mrs. Liese was not a patient at Bethesda. Her claims are based on her visits to Bethesda as Mr. Liese's "companion[]." *See* 28 C.F.R. § 36.303(c).

Mr. Liese first visited the hospital for an appointment in preparation for a hernia surgery. The Lieses asked a nurse for an in-person interpreter, but the nurse ignored the request and communicated with the Lieses by pen and paper and by trying to read their lips.

The Lieses returned to Bethesda a few days later for Mr. Liese's hernia surgery. Mr. Liese requested an in-person interpreter, but his nurses opted to use the VRI. The nurses, however, used the VRI only intermittently, and when they did use the VRI, it frequently malfunctioned. The VRI worked at times but was often blurry or failed to activate. Also, Mr. Liese has macular degeneration, so he could not see the VRI screen clearly, and on at least one occasion, he and Mrs. Liese were unable to comprehend the remotely located interpreter's signing. Mr. Liese, with the assistance of Mrs. Liese, e-mailed a representative from the Association shortly after his surgery explaining some of the communication difficulties he and his wife faced at Bethesda:

> I requested [a] live interpreter . . . on my arrival[, but] I was told they cannot find [a] live interpreter prior to the surgery. The interpreter on the VRI [w]as not very good[.] . . . [M]y wife . . . [could] not understand what [was] going on and the VRI interpreter did no[t] sign then [my nurse's] voice stop[ped] and the VRI [interpreter started] sign[ing,] which [was] not very clear. Then my wife told the VRI interpreter [that the interpreter] sh[ould] sign same time [as] the [n]urse. [The] VRI inter[]preter said she ha[d a] problem . . . get[ting] the [nurse's] voice in her earmicrophone . . . . It [was also] hard for me to see . . . the VRI.

8

The Lieses returned to Bethesda in late 2011 for Mr. Liese to receive treatment for a blood clot.  Mr. Liese asked his nurses for an in-person interpreter, but the nurses denied the request and used the VRI to communicate with the Lieses.  The VRI was blurry and repeatedly froze, and while the nurses were preparing Mr. Liese for discharge, one nurse struggled to operate the VRI and commented on the VRI's malfunctioning.

The Lieses live near Bethesda and are members of the Association.  Mr. Liese had a second hernia surgery in 2013 and suffers from a number of medical conditions.  Mrs. Liese also suffers from several conditions.  The Lieses' conditions are stable.

### D. John Virgadaula

Mr. Virgadaula is in his early 70s and visited Bethesda once in 2014 for a shoulder surgery.  The VRI was used to facilitate communication with Mr. Virgadaula during his pre-operation meetings with hospital staff, including his anesthesiology evaluation and his pre-operation interview.  Mr. Virgadaula's nurses, however, had difficulty setting up the VRI, and the VRI's remotely located interpreter intermittently became non-visible, preventing Mr. Virgadaula from receiving the full information communicated by his doctors and nurses.  These difficulties were evident to the nurses, who repeatedly attempted to correct the visibility issues.  Eventually, some hospital staff abandoned the VRI and resorted

9

to simply gesturing to Mr. Virgadaula.  Mr. Virgadaula's doctor, for example, resorted to gesturing in the moments leading up to Mr. Virgadaula's surgery. Mr. Virgadaula in his deposition reported:

> While they were [trying to fix the] VRI . . . the doctor was getting frustrated, . . . and then the doctor says, You know what—he looked at me and kind of gestured— Okay is it the right arm, right shoulder or the left shoulder?  So he's gesturing to me, asking which shoulder it is. . . .  And [then] he's gesturing this to me, sleep, you, and then shot in my shoulder.

Mr. Virgadaula lives near Bethesda and is a member of the Association.  He has a number of medical conditions, including hypertensive heart disease and cataracts.  The conditions are stable.

### E.  Jacqueline Gluckman

Ms. Gluckman is in her late 70s.  She visited Bethesda twice in 2011 for a biopsy procedure and many times thereafter for physical therapy and mammograms.  Ms. Gluckman first visited Bethesda on October 7, 2011, for her biopsy procedure.  Nurses attempted to communicate with her using the VRI, but the VRI did not work.  Ms. Gluckman therefore wrote a note to the nurses requesting an in-person interpreter.  The nurses declined the request, and because the nurses were unable to communicate with Ms. Gluckman, her procedure was rescheduled to October 11, 2011.  When Ms. Gluckman returned on October 11, her nurses used the VRI, but the VRI was blurry and "the picture was no good."

10

These problems caused confusion between Ms. Gluckman and hospital staff.

According to deposition testimony from Ms. Gluckman:

> [W]hen the doctor came in [to discuss the biopsy], he was all angry [about the VRI issues]. . . . I was trying to catch what he was saying on his lips. And [the nurses] were, you know, writing. And then they just said, like, Well just go ahead and do it. . . . I should have just walked out. I felt like I was just like a dog—just dog, like, they were just leading on, but they weren't explaining anything to me. And then they had put the needle in my arm and it started bleeding.

After her October 11 visit, Ms. Gluckman returned to Bethesda more than sixteen times for physical therapy and routine mammograms.

Ms. Gluckman lives near Bethesda and is a member of the Association. She has several medical conditions, including a sinus syndrome, coronary artery disease, arthritis, and hypertension. Although those conditions are generally stable, Ms. Gluckman has recently experienced neck and cervical pain.

## F. Carolann Donofrio

Mrs. Donofrio is around 80 years old and visited Bethesda twice in 2013 for a heart condition. When Mrs. Donofrio first visited Bethesda, nurses attempted to use the VRI to communicate with her, but they were unable to connect the VRI to a remotely located interpreter. Thereafter, the hospital obtained an in-person interpreter for Mrs. Donofrio. When Mrs. Donofrio returned to Bethesda later in 2013, nurses attempted to use the VRI, but the VRI was blurry, requiring the

11

nurses to repeatedly restart it. The hospital again arranged for an in-person interpreter.

Mrs. Donofrio lives near Bethesda. She suffers from a number of heart conditions but, according to her physician and cardiologist, is in no "acute stress."

### G. John Donofrio

John Donofrio is in his mid-70s and is married to Carolann Donofrio. In 2013, he suffered from food poisoning and went to Bethesda for treatment. Mrs. Donofrio accompanied him. Mr. Donofrio requested by way of a written note that hospital staff afford him either an in-person interpreter or the VRI, but staff provided neither. The Donofrios instead communicated with staff by pen and paper.

Mr. Donofrio currently lives near Bethesda, and he has diabetes and a few heart conditions. Those conditions are stable.

### H. Bodil Tvede

Ms. Tvede is in her mid-80s and was admitted to Bethesda in 2011 after a stroke. A nurse used the VRI to communicate with her at the beginning of her stay. At one point during that encounter, the VRI picture zoomed in on the remotely located interpreter's face, preventing Ms. Tvede from seeing the hands of the interpreter. Hospital staff relied on pen and paper, as well as "lip reading," to communicate with Ms. Tvede for the rest of her stay.

Ms. Tvede is a member of the Association, and she currently lives in Ohio.

## II. PROCEDURAL HISTORY

Ms. Sunderland, Ms. Drumm, the Lieses, Mr. Virgadaula, Ms. Gluckman, Mrs. Donofrio, Mr. Donofrio, Ms. Tvede, and the Association filed a joint complaint in district court raising disability discrimination claims under Section 504 and the ADA.[4]  The patients requested compensatory damages under Section 504, asserting that, during their individual encounters with Bethesda, Bethesda was deliberately indifferent to their Section 504 rights.  And the Association and the patients asked for injunctive relief under Section 504 and the ADA.[5]  The Association and the patients, alleging that various Bethesda policies and practices are discriminatory, requested an order requiring Bethesda to correct the policies and practices.

The district court severed the patients' claims into three trial groups, with the Association's claims constituting a separate, fourth group.  The first patient group included the claims of Ms. Sunderland, Ms. Drumm, and Mrs. Donofrio; the second group included the claims of the Lieses and Mr. Virgadaula;[6] and the third group included the claims of Ms. Gluckman, Mr. Donofrio, and Ms. Tvede.

---

[4] A tenth patient, Julia Feltzin, also raised claims in the complaint.  Ms. Feltzin, however, is not a party to this appeal.

[5] The Association, relying on "associational standing," requested injunctive relief on behalf of its members.  *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 2441 (1977) (internal quotation marks omitted).

[6] Ms. Feltzin's claims were also included in this second group.

Bethesda filed motions for summary judgment on all of the patients' claims, as well as on the Association's claims. The district court dismissed the patients' claims in three separate orders and, in a fourth order, dismissed the Association's claims.

In dismissing the patients' claims, the district court found that most of the patients established a triable issue as to whether Bethesda violated their Section 504 rights by denying them effective communication. However, the court determined that (1) no patient can obtain compensatory damages under Section 504 because none offered sufficient evidence of deliberate indifference and (2) no patient has standing to seek injunctive relief under Section 504 and the ADA because none showed a real and immediate threat of future injury.

The district court dismissed the Association's claims for Section 504 and ADA injunctive relief because the Association relied on the same future-injury evidence as the patients.

## III. STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment on the patients' claims for compensatory damages, "viewing all facts in the light most favorable to the [patients] and drawing all reasonable inferences in [their] favor." *See McCullum*, 768 F.3d at 1141. Summary judgment may be granted only if "there is no genuine issue as to any material fact and the moving party is entitled to

14

a judgment as a matter of law." *Id.* A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

We review the district court's conclusion that the patients and the Association lack standing to seek injunctive relief "anew, without deference to the . . . court's legal conclusions." *Am. Civil Liberties Union of Fla., Inc., v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1190 (11th Cir. 2009).

## IV. DISCUSSION

This appeal presents fact-intensive questions: (1) whether any of the individual patients established a triable issue of deliberate indifference and (2) whether any of the individual patients (or the Association) established standing to seek injunctive relief.[7] Based on our review of the evidence related to each patient, we hold that some of the patients (Ms. Sunderland, the Lieses, Mr. Virgadaula, and Ms. Gluckman) have established a triable issue of deliberate indifference and that one of the patients (Ms. Gluckman) and the Association have established standing.

### A. Deliberate Indifference

---

[7] In addition to challenging the district court's dismissal of their claims, the patients and the Association argue that the court abused its discretion in severing the patients' claims into three trial groups. *See Weatherly v. Ala. State Univ.*, 728 F.3d 1263, 1269 (11th Cir. 2013) ("We review a district court's decision . . . to sever for abuse of discretion."). We conclude that the district court acted within its discretion in severing the claims.

Under Section 504, Bethesda must provide to deaf patients and visitors interpretive aids that are "necessary to ensure effective communication." *See Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 341, 351 (11th Cir. 2012); 28 C.F.R. § 36.303(c)(1) ("A public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities."). But to obtain compensatory damages, a deaf patient or visitor must show more than a denial of effective communication—she must show deliberate indifference. *Liese*, 701 F.3d at 344–45, 348.

A defendant organization is deliberately indifferent under Section 504 if an official of the organization knows that harm to an individual's Section 504 rights is substantially likely and the official fails to act on that likelihood. *See id.* at 344, 349. "[A]n official is someone who enjoys substantial supervisory authority within an organization's chain of command so that, when dealing with the complainant, the official had complete discretion at a key decision point in the administrative process." *Id.* at 350 (internal quotation marks omitted). A hospital employee has "complete discretion at a key decision point" in the hospital's accommodation process if she has authority to decide whether a patient can access an accommodation and the decision is generally not reviewed by a higher authority, even though the decision is "technically subject to review." *See id.* Whether an employee has such authority is "necessarily a fact-based inquiry." *See Doe v. Sch.*

16

*Bd. of Broward Cty.*, 604 F.3d 1248, 1256 (11th Cir. 2010) (internal quotation marks omitted).

Taking the evidence in the light most favorable to the patients, a jury could find that Bethesda nurses are officials and that the nurses were deliberately indifferent to the Section 504 rights of Ms. Sunderland, the Lieses, Mr. Virgadaula, and Ms. Gluckman. However, the evidence is insufficient to support a finding that the nurses were deliberately indifferent to the rights of Ms. Drumm, Mrs. Donofrio, Mr. Donofrio, or Ms. Tvede.

1. <u>Under *Liese*, a jury could conclude that Bethesda nurses are officials.</u>

In *Liese*, two deaf individuals alleged that a hospital violated their Section 504 rights to effective communication. We found that a triable issue existed as to whether doctors at the hospital were officials. *See Liese*, 701 F.3d at 350–51. A jury could have found that the doctors were officials, we held, because the record suggested that the doctors had "supervisory authority" over hospital patients' access to interpretive aids. *See id.* at 350. That is to say, the record supported a finding that the doctors had "discretion to decide whether or not to provide [a patient] with an interpretive aid." *See id.* "[N]o evidence . . . suggest[ed] that the doctors' decisions" about whether a patient should receive an interpretive aid "were subject to reversal." *Id.* And the hospital's interpretive-aid policy indicated that the doctors had broad discretion over patient access to

interpretive aids. *Id.* The policy "offer[ed] no guidance or recommendation as to when doctors or nurses should use [interpretive] aids; rather, it afford[ed] the [hospital] staff complete discretion in [such] matters." *Id.*

The evidence related to Bethesda nurses' authority over interpretive aids is similar to the evidence related to the *Liese* doctors' authority. When the evidence is viewed in the light most favorable to the patients, Bethesda nurses can be seen as having "supervisory authority" over a patient's access to interpretive aids. *See id.* The record indicates that nurses decide whether to provide the VRI or other, less-substantive interpretive aids to a patient; nurses have authority to take corrective measures when problems with the VRI arise; and in most situations, a patient can access an in-person interpreter only if her nurse decides that the VRI and other aids are not appropriate. Testimony from the patients suggests that (1) nurses manage access to the VRI, as well as to less-substantive interpretive aids, and (2) nurses have authority to reject unilaterally requests for in-person interpreters. And the remainder of the record lends support to such testimony; the record supports a finding that nurses' decisions about when to provide and when to abandon the VRI are generally not "subject to reversal." *See id.* Indeed, like the policy in *Liese*, Bethesda's VRI policy provides hospital staff no guidance on when the VRI or

18

another accommodation is appropriate.  Nurses are afforded "complete discretion" in implementing the policy.  *See id.*[8]

> 2. A jury could find that Bethesda nurses were deliberately indifferent to Ms. Sunderland's, the Lieses', Mr. Virgadaula's, and Ms. Gluckman's Section 504 rights.

A jury could find that Ms. Sunderland, the Lieses, Mr. Virgadaula, and Ms. Gluckman were denied effective communication; that nurses were aware of the denials; and that the nurses refused to correct the denials.  *See id.* at 351 (holding that a triable issue of deliberate indifference existed because a hospital doctor "knew that [the hospital] failed to provide [the plaintiff] with appropriate auxiliary aids necessary to ensure effective communication" but decided not to correct the failure).  The evidence indicates that the nurses, knowing the patients required an interpretive aid, relied on the VRI to facilitate communication with the patients; were put on notice that the VRI was not accommodating the patients;[9] and chose to persist in using the VRI without correcting its deficiencies.[10]  *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290, 118 S. Ct. 1989, 1999 (1998) ("[W]e hold that a damages remedy [is not available] . . . unless an official . . . has

---

[8] Our determination that a jury could find that Bethesda nurses are officials is a fact-intensive determination.  We offer no opinion on whether nurses in other healthcare facilities can be considered officials.

[9] In reaching this conclusion, we do not find that a triable issue of ineffective communication exists anytime a hospital uses a VRI.  Rather, we conclude only that a jury could find that the VRI, as administered to the patients here, was ineffective.

[10] In fact, it appears that the nurses even abandoned the VRI altogether at times without providing an alternative interpretive aid.

actual knowledge of discrimination . . . and fails adequately to respond."). In other words, the evidence supports a finding that the nurses disregarded a substantial risk that the patients were being denied effective communication. *See Liese*, 701 F.3d at 344, 351.

Ms. Sunderland requested an in-person interpreter at the beginning of her stay, placing her nurses on notice that she required an interpretive aid. Yet the nurses denied the request and provided neither the VRI nor any other interpretive aid. Consequently, prior to an invasive procedure, Ms. Sunderland was forced to communicate with her doctor through gesturing. And although the nurses decided to provide Ms. Sunderland the VRI after the procedure, the VRI was blurry and frequently froze, infringing Ms. Sunderland's ability to communicate through the VRI. *See* 28 C.F.R. § 36.303(c)(1)(ii) ("In order to be effective, auxiliary aids and services must be provided in accessible formats . . . ."); *id.* § 36.303(f) ("A public accommodation that chooses to provide qualified interpreters via VRI service shall ensure that it provides . . . video and audio over a . . . connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication . . . ."). Ms. Sunderland's son complained to the nurses about these issues and requested an in-person interpreter. "A reasonable juror could well find from these facts that [the nurses] knew that" the VRI was not allowing Ms. Sunderland "to understand the" medical services she was receiving.

20

*See Liese*, 701 F.3d at 351.  Even so, the nurses denied Ms. Sunderland and her son's requests for an in-person interpreter and otherwise refused to correct the VRI's deficiencies.[11]  *See id.* ("[A hospital official's] apparent knowledge that [a patient] required an additional interpretive aid to effectively communicate with him and his deliberate refusal to provide that aid satisfies the deliberate indifference standard.").

The Lieses requested an in-person interpreter during each of their visits to Bethesda, placing Mr. Liese's nurses on notice that they required an interpretive aid.  Mr. Liese's nurses denied the requests and relied on the VRI to facilitate communication.  In their administration of the VRI, the nurses arguably demonstrated disregard for the Lieses' communication needs.  The nurses failed to use the VRI consistently despite their knowledge that the Lieses required an interpretive aid.  And when the nurses used the VRI, it often froze or was blurry—deficiencies that the nurses recognized and that obviously thwarted the VRI's serving as an "appropriate" interpretive aid.  *See* 28 C.F.R. § 36.303(c), (f).  Further, in the presence of one of the nurses, the Lieses indicated that they were struggling to follow the remotely located interpreter's signing.  The nurses, however, chose to continue using the VRI, making no effort to seek an effective

---

[11] Beyond seeking an in-person interpreter, a number of strategies for correcting the VRI's deficiencies appear to have been available to the nurses.  The nurses, for example, could have contacted Bethesda's technical-support personnel to fix the VRI or could have taken the steps necessary to provide effective written communications.

21

alternative such as the interpretive aid requested by the Lieses—an in-person interpreter.  *See Liese*, 701 F.3d at 351.

Mr. Virgadaula's nurses relied on the VRI to facilitate communications, but the remotely located interpreter repeatedly became non-visible, depriving Mr. Virgadaula of substantial information that hospital staff were attempting to communicate.  The nurses recognized this deficiency but continued to rely on the VRI.  *See Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1140 (9th Cir. 2001) (finding a jury issue of deliberate indifference because, among other things, a public entity was on notice that a particular accommodation was "inadequate" but the entity persisted in relying on the accommodation); *cf. Gebser*, 524 U.S. at 290, 118 S. Ct. at 1999.  That decision, unsurprisingly, resulted in communication breakdowns between Mr. Virgadaula and his doctor just prior to an invasive procedure.

Ms. Gluckman had a similar experience at Bethesda as Mr. Virgadaula.  Her nurses relied on the VRI, but the picture on the VRI screen was blurry and not cognizable, thereby thwarting the effectiveness of the VRI.  *See* 28 C.F.R. § 36.303(c), (f).  The nurses and Ms. Gluckman's doctor all recognized this deficiency; in fact, the doctor expressed frustration about the VRI's ineffectiveness.  But the nurses chose to continue using the VRI without correcting the deficiency.  *See Duvall*, 260 F.3d at 1140; *cf. Gebser*, 524 U.S. at 290, 118 S. Ct. at 1999.

3. <u>The evidence set forth by Ms. Drumm, Mrs. Donofrio, Mr. Donofrio, and Ms. Tvede is insufficient to support a finding of deliberate indifference.</u>

Although Ms. Drumm, Mrs. Donofrio, Mr. Donofrio, and Ms. Tvede may have been denied effective communication, a jury could not find that a nurse—or any other Bethesda employee—knew such a denial was substantially likely and failed to act.[12]  First, Ms. Drumm, Mr. Donofrio, and Ms. Tvede offered no evidence from which a jury could find that a nurse knew their right to effective communication was likely being violated.  Ms. Drumm and Ms. Tvede were provided the VRI, but no evidence indicates that during the administration of the VRI there were deficiencies of which their nurses had notice.  Mr. Donofrio was accommodated with pen and paper rather than the VRI or an in-person interpreter, but based on the record, his nurses had no reason to believe that the notes were an ineffective accommodation.  Second, Mrs. Donofrio's claim of deliberate indifference is belied by Bethesda's providing her in-person interpreters when the VRI was ineffective.

**B. Standing to Seek Injunctive Relief**

---

[12] The patients claim that Bethesda's President, a Nursing Supervisor (Kerr), and the Vice President of Risk Management (Ritson) acted with deliberate indifference because they were notified that Bethesda's approach to the VRI was causing communication failures but failed to act.  However, the evidence at most shows that the President, Kerr, and Ritson were aware of a few instances where the VRI malfunctioned or was otherwise ineffective.  A mere awareness that the VRI was sometimes ineffective does not amount to knowledge that Bethesda's approach to the VRI was substantially likely to lead to violations of patients' Section 504 rights.

The patients' "standing to seek the injuncti[ve relief] requested depends on whether [they are] likely to suffer future injury."[13] *See Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1334 (11th Cir. 2013) (internal quotation marks omitted). A "sufficient likelihood" must exist that the patients "will be affected by [Bethesda's] allegedly unlawful conduct in the future." *See id.* at 1328 (internal quotation marks omitted). This requires the patients to establish "a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury." *See id.* at 1334 (internal quotation marks omitted). To establish such a threat, each patient must show that (1) there is a "real and immediate" likelihood that she will return to Bethesda and (2) she "will likely experience a denial of benefits or discrimination" upon her return. *See McCullum*, 768 F.3d at 1145–46.

The district court erred in finding that Ms. Gluckman lacks standing, but the court did not err in determining that the remaining eight patients lack standing.

Ms. Gluckman has shown a real and immediate likelihood that she will return to Bethesda, and she has shown that upon her return she will likely experience discrimination. First, since 2011, Ms. Gluckman has visited Bethesda more than sixteen times, and some of the visits were for routine screenings— annual mammograms. Because Ms. Gluckman has a family history of breast

---

[13] Given the nature of the Association's claims and the record before us, the Association's standing turns on the standing of the patients who are Association members. *See Hunt*, 432 U.S. at 342–43, 97 S. Ct. at 2441.

24

cancer, she regularly undergoes mammograms. Her Bethesda records show that she visited Bethesda in 2013, 2014, and 2015 for mammograms. Given the frequency of Ms. Gluckman's visits and the routine nature of her screenings, the likelihood that she will return to Bethesda in the immediate future is not merely conjectural. Second, the evidence indicates that, on more than one occasion, Bethesda failed to accommodate Ms. Gluckman, and no evidence suggests that Bethesda has taken steps to prevent such a failure in the future. *See Houston*, 733 F.3d at 1336 ("[A] plaintiff's exposure to illegal conduct in the past is . . . evidence bearing on whether there is a real and immediate threat of repeated injury." (internal quotation marks and citation omitted)).[14]

The remaining eight patients, however, have not established standing because they have not shown a real and immediate likelihood that they will return to Bethesda. The eight patients argue that, since they have medical conditions that could at any time require them to visit a hospital, they have demonstrated a real and immediate likelihood of returning to Bethesda. But the evidence shows that the patients' conditions are stable. *See McCullum*, 768 F.3d at 1146 (holding that a plaintiff who had surgery at a hospital did not show a real and immediate threat of

---

[14] Because Ms. Gluckman, a member of the Association, has standing, the Association also has standing to pursue injunctive relief. The Association has satisfied the requirements for associational standing. At least one of the Association's members, Ms. Gluckman, has standing to "sue in [her] own right"; the interests that the Association "seeks to protect are germane to [its] purpose"; and "neither the claim asserted nor the relief requested requires the participation of [the Association's] individual members." *See Hunt*, 432 U.S. at 343, 97 S. Ct. at 2441.

returning to the hospital because the evidence demonstrated that he could control his symptoms thereafter with medication).  Although the patients might some day return to Bethesda for treatment, the evidence does not establish a real and immediate likelihood that they will do so.  *See Houston*, 733 F.3d at 1338 ("'[S]ome day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of [standing].").

## V. CONCLUSION

We reverse the district court's grant of summary judgment to Bethesda on Ms. Sunderland's, the Lieses', Mr. Virgadaula's, and Ms. Gluckman's Section 504 claims for compensatory damages.  We also reverse the district court's dismissal on standing grounds of Ms. Gluckman's and the Association's Section 504 and ADA claims for injunctive relief.  We remand each for further proceedings consistent with this opinion.  We affirm the remainder of the district court's findings.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**