Biondo v. Kaleida Health

# United States Court of Appeals
# for the Second Circuit

AUGUST TERM 2018
NO. 18-1375

KATHLEEN BIONDO,
*Plaintiff-Appellant*,

*v.*

KALEDIA HEALTH, D/B/A BUFFALO GENERAL MEDICAL CENTER
*Defendant-Appellee*.

ARGUED: MAY 10, 2019
DECIDED: AUGUST 19, 2019

Before:    JACOBS, LEVAL, *Circuit Judges*; FURMAN[*], *District Judge*.

Kathleen Biondo, who is profoundly deaf, appeals from a judgment of the District Court for the Western District of New York (Geraci, J.) dismissing on summary judgment her claim that a hospital violated the Rehabilitation Act by failing to provide an ASL interpreter.   We conclude that material issues of fact preclude summary judgment.   Vacated and remanded.

> ANDREW ROZYNSKI, JUYOUN HAN, AND
> JENNIFER L. KARNES, EISENBERG & BAUM,
> LLP, NEW YORK, NY, FOR THE APPELLANT.

---

[*] Judge Jesse M. Furman, of the United States District Court for the Southern District of New York, sitting by designation.

MARK R. AFFRONTI, ROACH, BROWN, MCCARTHY & GRUBER, BUFFALO, NY, FOR THE APPELLEE.

DENNIS JACOBS, *Circuit Judge*:

Kathleen Biondo, who is profoundly deaf, appeals from a judgment dismissing on summary judgment her claim that a hospital violated the Rehabilitation Act by failing to provide an American Sign Language ("ASL") interpreter. We conclude that material issues of fact preclude summary judgment.

In 2014, Biondo sought treatment at the Buffalo General Medical Center ("BGMC") for recurrent episodes of fainting. She and her husband, who is not hearing impaired, unsuccessfully requested an ASL interpreter from hospital staff several times during her six-day stay. Biondo has alleged violations of Section 504 of the Rehabilitation Act (the "RA"), Title III of the Americans with Disabilities Act (the "ADA"), the New York State Human Rights Law (the "NYSHRL"), and the City of Buffalo Antidiscrimination Law (the "CBAL"). The United States District Court for the Western District of New York (Geraci, J.) granted BGMC's motion for summary judgment as to the RA and ADA claims and dismissed Biondo's state and municipal law claims without prejudice.

2

Biondo appeals the dismissal of her RA claim for damages, having abandoned her claims for injunctive and declaratory relief pursuant to the RA and ADA.

This appeal concerns whether and when hospital staff members may be considered to be acting as 'officials' or 'policymakers' of the hospital so that their conduct may be attributed to the hospital and thereby establish the plaintiff's right to damages on the ground that the defendant institution was 'deliberately indifferent' to a violation of the RA. BGMC's internal policies require the provision of interpreter services in certain situations, including eliciting medical history, explaining treatment, and giving discharge instructions. Because the record contains evidence that the hospital staff at issue had knowledge of the deprivation of Biondo's right to an interpreter, had the power to cure that violation, and failed to cure it, summary judgment in favor of BGMC was inappropriate.

## BACKGROUND

**The Hospital Stay.** Biondo, who was born deaf, reads at a fourth-to-fifth grade level, has unintelligible speech, and cannot lipread well. She is, however, fluent in ASL. Her husband has no training in ASL and communicates with his

3

wife in a combination of ASL and private signs and signals.[1]    The Biondos also

communicate, with some limitations, via text message.

Biondo was admitted to BGMC on September 21, 2014, after she

experienced several fainting episodes, tightness in her chest, and skipped

heartbeats.    Biondo's hospital admission documentation solicits "Preferred

Mode of Communication"; the form indicates "Written."    Nevertheless, on the

day of their arrival at BGMC, both Biondos made requests for an ASL interpreter

from several hospital staff: the attendant working at the arrival desk; nurses who

escorted Biondo to a room and checked her vital signs; nurses in the emergency

room; and nurses in the department to which Biondo was admitted.    During her

six-day hospitalization, she communicated with staff mostly by writing and

---

[1] The district court found, citing no evidence, that Mr. Biondo "knows ASL."    App'x
179.    However, while the single linguistic evaluation of Mr. Biondo in the record,
performed by Dr. Judy Shephard-Kegl, found that he has "good conversational signing
skills (Basic Interpersonal Communication Skills[)] (BICS) in ASL," it also found that he
lacks "Cognitive Academic Language Proficiency (CALP) in ASL," and that "[h]is
signing is not ASL" but rather "a coding of English into signing."    Id. at 83.
Moreover, while the district court noted that Mr. Biondo has "had experience
interpreting for his wife at some of her past medical appointments," id. at 179 it did not
acknowledge Shephard-Kegl's conclusion that he is "neither competent, nor qualified,
to interpret for his wife in a medical setting."    Id. at 83.    The district court's
observations fail to "resolv[e] all ambiguities and draw[] all reasonable factual
inferences in favor of the party against whom summary judgment is sought."    Nick's
Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 113 (2d Cir. 2017).

4

through her husband (over his objection) when he visited.

Biondo testified that she "kept requesting an interpreter, and they . . . kept saying, 'we will, we will, we will.'" App'x 227. Biondo made these requests by pointing at her left ear, by writing, and through her husband on his visits. No interpreter was provided during Biondo's hospitalization. At some point, the Biondos gave up.

During her stay, Biondo provided and received information on her condition and underwent medical procedures, without an interpreter. The day after she checked in, Dr. Oliva Balan obtained her medical history with Mr. Biondo as interpreter. No interpreter was present when Dr. Donald Switzer examined Biondo for a cardiology consult or when Nurse Edwin Sewastynowicz performed a vascular invasive pre-procedure record, which included explanations of treatments and an opportunity for Biondo to ask questions. That same day, Biondo underwent a tilt table test, in which the patient is fixed to a table that is tilted until the patient faints. Before the test began, Biondo again unsuccessfully asked for an interpreter. Also before the test, Biondo was provided a generic informed consent form with a description of the procedure to be administered:

5

[Y]ou will be placed in an upright position and your heart rate and blood pressure will be monitored. Medication will be given to help you relax. The oxygen in your blood will be monitored.

S. App'x 38. The form also contained a page of authorizations and waivers. Biondo testified that she signed the consent form and underwent the test without understanding what she was signing or what the test entailed. Biondo took the test without her husband present, and testified that she was scared, cried, and (at one point) asked Dr. Switzer if she was going to die.

On September 24, the fourth day, Biondo was visited in her room by Nurse Jennifer DiPasquale, the nurse manager of the unit to which Biondo was admitted. DiPasquale testified that she communicated with Biondo via written notes and specifically asked Biondo whether that was sufficient:

> A. Whether I wrote it, stated it, I don't remember – I do remember posing the question, "Is this okay with you to communicate like this?" And she said yes.
>
> Q. Okay. So you have a specific memory of writing to Ms. Biondo, "Is it okay to communicate with you like this?"
>
> A. I do.

App'x 204. Biondo does not specifically dispute this account, though she disputes generally that she ever stated a preference for written communication and claims that she was forced to use writing for lack of options. On September

25, Biondo met with a physical therapist, with whom she communicated in writing; but Biondo testified that she frequently pointed at words and shook her head to indicate that she did not understand. When Biondo was discharged on September 26, she communicated in writing (without an interpreter) with Dr. Balan and with a discharge planner who gave her discharge materials that Biondo signed.

**BGMC's Interpreter Policy.** BGMC has an "Interpreter/Translation/Teletypewriter" policy (the "Interpreter Policy") that governs the "process and procedure for identifying and assessing the language needs of Kaleida Health [BGMC] patients." S. App'x 163. It states:

> Kaleida Health staff must inform the . . . patient of his/her right to free . . . Deaf/Hearing Impaired services. These services are provided to the patient, family member and/or companion at no cost.

Id. The policy specifies that interpreter services "must be provided" in several circumstances, including the explanation of procedures, tests, treatment, treatment options, discharge instructions, and determination of a patient's medical history. Id. As to responsibility for implementation:

> The department where the patient presents is responsible for initiating interpreter services as outlined in this policy. Any department referring a . . . Deaf/Hearing Impaired patient to another Kaleida department must notify the receiving department of the patient's identity, the language s/he speaks, and approximate arrival time.

Id. at 164. The policy advises that teletypewriter machines are available, and includes the names and phone numbers of three "Kaleida Health approved community vendor organizations" that provide "community face-to-face interpreters," from which "Departments may request an interpreter." Id. These vendors include Deaf Adult Services, for which the policy provides an additional phone number in case "an emergent situation arises and an interpreter . . . is needed after normal business hours." Id. at 165. As to interpreting services by others:

> If the patient declines the offer of an interpreter and requests that a family member, friend, or other party, facilitate communication on his/her behalf, such a person may be used only if the staff member is reasonably comfortable that the person will provide effective communication on the patient's behalf. Staff must request that the patient or legal representative sign a "Waiver of Interpreter/Translator Services," in the patient's primary language.

Id. No waiver was obtained from Biondo for the use of her husband as an interpreter.

8

**Procedural History.** Biondo sued BGMC in the Western District of New York on April 24, 2015, alleging claims under the ADA, the RA, the NYSHRL, and the CBAL, and seeking damages, attorney's fees, injunctive relief, and a declaratory judgment. Following the close of discovery, the district court granted BGMC's motion for summary judgment. The district court dismissed the RA damages claim because Biondo failed to establish deliberate indifference by showing that a BGMC official was aware of a potential violation of her rights, and failed to respond adequately. The court found that DiPasquale was the only doctor or nurse whose indifference could be attributed to BGMC, but that the record did not support a finding that DiPasquale had any knowledge of any such violation. See Biondo v. Kaleida Health, No. 15-cv-362 (FPG) (LGF) 2019 WL 1726533, at *6 (W.D.N.Y. Apr. 10, 2018). The district court also ruled that Biondo lacked standing for injunctive relief because she failed to demonstrate an ongoing or likely future injury. Id. at *7. Her stated reluctance to use BGMC was in part premised on its failure to supply ASL translation services.[2] Having

---

[2] In concluding that Biondo had "not shown that she is likely to visit Defendant in the future," the district court relied in part on Biondo's deposition testimony "that she would only come back to Defendant if she had 'no choice.'" Biondo, 2019 WL 1726533 at *7. The issue is not before us on appeal, and the other grounds cited by the district court may have sufficed. However, Biondo's relevant deposition testimony, construed

9

dismissed Biondo's federal claims, the district court declined to exercise

supplemental jurisdiction over the NYSHRL and CBAL claims. <u>Id.</u>


## DISCUSSION

We review a grant of summary judgment de novo, "construing the

evidence in the light most favorable to the nonmoving party and drawing all

reasonable inferences in his favor." <u>McElwee v. Cty. of Orange</u>, 700 F.3d 635,

640 (2d Cir. 2012). A moving party is entitled to summary judgment if the

record reveals "no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual

dispute is genuine "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.

242, 248 (1986).

---

favorably to her, was that she has some interest in BGMC's services but is reluctant to use them in light of BGMC's inadequate interpretive services. Biondo made precisely this argument in her opposition to BGMC's motion for summary judgment. It would be error to conclude that a plaintiff lacks standing to seek an injunction solely because the continuation of the violation for which she seeks redress will dissuade her from using the infringing service. <u>See</u> <u>Friends of the Earth, Inc. v. Laidlaw Environment Services (TOC), Inc.</u>, 528 U.S. 167, 182 (2000).

10

**The Rehabilitation Act**

Section 504 of the RA prohibits a program or activity receiving federal funds from excluding or discriminating against persons based on disability. See 29 U.S.C. § 794(a). The implementing regulations provide additional requirements. First, "[a] recipient hospital that provides health services or benefits shall establish a procedure for effective communication with persons with impaired hearing for the purpose of providing emergency health care." 45 C.F.R. § 84.52(c). Second, "[a] recipient . . . that employs fifteen or more persons shall provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question." 45 C.F.R. § 84.52(d)(1). While the RA "does not ensure equal medical treatment," it does require "equal access to and equal participation in a patient's own treatment." Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 275 (2d Cir. 2009).

To establish a prima facie violation of the RA, Biondo must show that she (1) is a "handicapped person" as defined by the RA; (2) is "otherwise qualified" to participate in the offered activity or benefit; (3) was excluded from such participation solely by reason of her handicap; and (4) was denied participation

in a program that receives federal funds. Id. Monetary damages may be recovered only upon a showing of intentional discrimination. Intentional discrimination does not require a showing of animosity or ill will; it may be inferred when a qualifying "official," id. at 276, or "policymaker," id. at 275 (quoting Bartlett v. New York State Bd. of Law Examiners, 156 F.3d 321, 331 (2d Cir. 1998)), "acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result," id. (quoting Bartlett, 156 F.3d at 331).

The standard for deliberate indifference is set out in Loeffler, in which a panel of this Court looked to the Supreme Court's holding in the Title IX context that damages are not recoverable unless

> an official who at a minimum [1] has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf [2] has actual knowledge of discrimination in the recipient's programs and [3] fails adequately to respond.

Id. at 276 (quoting Gebser v. Lago Vista Indep. School Dist., 524 U.S. 274, 290 (1998)). Loeffler explained that such indifference must reflect a "deliberate choice among various alternatives" and may not be inferred from mere "negligence or bureaucratic inaction." Id. (quoting Reynolds v. Giuliani, 506

12

F.3d 183, 193 (2d Cir. 2007)).[3]

**Violation of the Rehabilitation Act.** The district court acknowledged that "[w]hether [Biondo's] rights were violated under the RA is likely a triable issue of fact." Biondo, 2018 WL 1726533 at *5. BGMC does not dispute that Biondo was handicapped under the RA and was otherwise qualified to benefit from the hospital's services, or that the hospital receives federal funds. While the RA does not in terms require the use of interpreters, a reasonable jury could find, given the circumstances, that the failure to provide one deprived Biondo of "an equal opportunity to benefit from" the hospital's services given her limitations with written English, the length of her hospital stay, and the procedures performed and information imparted during her stay. 45 C.F.R. § 84.52(d)(1). BGMC does not persuasively argue otherwise.

**Deliberate Indifference.** Having determined that the RA may have been

---

[3] The facts of Loeffler have several points of similarity to Biondo's claim: a deaf patient undergoing heart surgery (and his wife) unsuccessfully sought an interpreter; one request was made to the surgeon. Id. at 272. Loeffler identified a question of fact as to deliberate indifference because "persons at the Hospital had actual knowledge of discrimination against the [plaintiff], had authority to correct the discrimination, and failed to respond adequately." Id. at 276.

violated, we consider compensatory damages, which are available only if a defendant was deliberately indifferent to the potential violation of the RA in that someone at the hospital "had actual knowledge of discrimination against the [plaintiff], had authority to correct the discrimination, and failed to respond adequately." Loeffler, 582 F.3d at 276.

During her hospitalization, both before and after her interaction with Nurse DiPasquale--whose role we need not address here--Biondo interacted with a number of other doctors, nurses, and staff that she claims were deliberately indifferent. BGMC argues that Biondo failed to argue below that they are officials or policymakers whose indifference may be attributed to BGMC, and thus waived the point. True, Biondo's summary judgment briefs did not specifically and expressly argue that BGMC staff were officials. But BGMC did not address the issue either, see Def.'s Mem. of Law at 11–15, No. 15-CV-362 (S.D.N.Y. Jan. 1, 2017) No. 51; Def.'s Reply Mem. of Law at 7–10, No. 15-CV-362 (S.D.N.Y. March 17, 2017) No. 55, and it was BGMC's obligation to show entitlement to summary judgment, Fed. R. Civ. P. 56(a); see Nick's Garage, 875 F.3d at 113–114. The issue of who was (or was not) an official was hardly discussed at all: Biondo argues in one sentence that DiPasquale was "in a

14

position of 'authority to correct the discrimination.'"   App'x 77 (quoting

Loeffler, 582 F.3d at 276).   Biondo's failure to raise the argument therefore

reflects the parties' focus on other issues.   In any event, Biondo *did* argue below

that "BGMC staff, doctors and nurses, knew Ms. Biondo was deaf and yet failed

to offer her a sign language interpreter," App'x 76, that "the conduct of BGMC's

staff amounts to deliberate indifference," id., and that the staff "failed to adhere

to" BGMC's policies on interpreters, id.; see also id. at 78.   In these

circumstances, we cannot agree that the issue was waived.

Turning to the merits of the argument, the record supports an inference

that the staff had actual knowledge of the potential RA violation.   Biondo and

her husband repeatedly asked nurses for an interpreter when she first arrived at

the hospital; and Biondo continued to request an interpreter and expressed her

dissatisfaction with written communication by, for example, pointing to words

she didn't understand and shaking her head.

It is uncontested that the hospital did not take action in response to the

Biondos' requests.   In addition, there is evidence that the doctors and nurses at

BGMC had authority to call for an interpreter.

First, the Interpreter Policy provides that "[t]he department where the

15

patient presents is responsible for initiating interpreter services," S. App'x 164, and requires a department referring a deaf patient to notify the receiving department of the disability. That leaves uncertain which employee in the department has *responsibility* for ordering an interpreter. However, the Policy lists phone numbers for contacting interpreter services, indicating that *authority* to order an interpreter is widely dispersed. Id. at 165.

Second, DiPasquale's testimony further evidences that doctors and nurses had the authority to provide an interpreter for Biondo. DiPasquale testified that if a staff member determined that a patient could not communicate effectively, "they would have to go to the [Interpreter Policy] and get an interpreter and inform the patient that--that we would provide that." App'x 198–99. Asked "how do staff go about securing a sign language interpreter through vendors," DiPasquale answered, "[e]mbedded in the policy is a phone number for those services to contact." Id. at 194. She also testified that the Interpreter Policy is accessible on BGMC's intranet site, which employees can access from any computer within the hospital. According to DiPasquale, BGMC's nurses and doctors were as fully empowered to correct the violation as she was.

16

Taken together, the Interpreter Policy and DiPasquale's testimony create a dispute of fact as to whether BGMC hospital staff--including its doctors and nurses--had the authority to correct the deprivation of Biondo's rights by calling or requesting an interpreter for her.

BGMC argues that none of the BGMC staff who were arguably aware of the deprivation was a person whose deliberate indifference could give rise to liability for damages on behalf of BGMC. That is, none was an "official," Loeffler, 582 F.3d at 276 (quoting Gebser, 524 U.S. at 290), or a "policymaker," id. at 268 (quoting Bartlett, 156 F.3d at 331). BGMC emphasizes the Eleventh Circuit's definition of an official: "someone who enjoys substantial supervisory authority within an organization's chain of command so that, when dealing with the complainant, the official had complete discretion at a 'key decision point' in the administrative process." Liese v. Indian River County Hospital District, 701 F.3d 334, 350 (11th Cir. 2012); see also, id. ("[T]he purpose of the 'official' requirement is to ensure that an entity is only liable for the deliberate indifference of someone whose actions can fairly be said to represent the actions of the organization.").

We decline to adopt the Eleventh Circuit's definition insofar as it includes

the requirement that a person enjoy "substantial supervisory authority" within an organization. The requirement is unspecific, and unhelpful in the setting of a large, ramified institution where many patients and visitors do not interact with a supervisor, or know how to identify one, much less how to find one. In any event, it appears to be a sufficiently flexible requirement that the Eleventh Circuit has applied it to include nurses. See Sunderland v. Bethseda Hospital, Inc., 686 F. App'x 807, 816 (11th Cir. 2017) (finding a dispute of fact as to whether hospital nurses exercised supervisory authority when they decided what interpretative aids are appropriate for a deaf patient, had authority to take corrective measures, and often were the sole means by which deaf patients accessed an interpretive aid).

On the other hand, we agree that an "official" or "policymaker" must be someone who has some "discretion at a 'key decision point' in the administrative process." Liese, 701 F.3d at 350. Given the hierarchy of a hospital, the key decision point will vary with the decision to be made, and the official or policymaker with discretion to make the decision will vary accordingly. But that observation is already embedded in our requirement that an official have "authority to address the alleged discrimination and to institute corrective

18

measures on the recipient's behalf." Loeffler, 582 F.3d at 276. We see no reason to disturb the test set out in Loeffler.[4]

Finally, the district court ruled that the failure to provide Biondo with an interpreter is attributable to "negligence or bureaucratic inaction." Biondo, 2018 WL 1726533 at *6. That may be so, and a jury may so find. But the finding is not compelled. A jury might also find that certain staff members observed Biondo struggling to communicate, knew that she chiefly used ASL and lacked the education to communicate adequately in writing, had the authority to call for an ASL interpreter, and deliberately failed to do so notwithstanding repeated requests. The facts of this case are arguably worse than those of Loeffler, where

---

[4] We do not imply that a hospital could absolve itself of liability for damages by failing to empower staff members who have contact with patients to cure potential violations of the RA, such as by failing to empower front-line staff to procure a necessary interpreter. Indeed, a hospital might be liable precisely because its policymakers fail to put in place a policy that would reasonably enable a patient to obtain the relief guaranteed by the RA by complaining to the staff with whom she has contact. In that circumstance it might be argued that the "policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the [challenged] policy." Loeffler, 582 F.3d at 275 (quoting Bartlett, 156 F.3d at 331). That argument is especially strong in cases such as this where a regulation expressly addresses a particular need, see 45 C.F.R. § 84.52(d)(1) (stating that subject hospitals "shall provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills"), effectively putting hospital policymakers on notice that they must ensure the hospital's policies are reasonably capable of meeting that need.

19

at least one hospital employee "made some efforts . . . to find an interpreter." 583 F.3d at 277.

For the foregoing reasons, the judgment of the district court is **VACATED** and the case is **REMANDED** for further proceedings consistent with this opinion.